**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.

PAUL PETERSON, aka Paul Joseph
Peterson,

          *Defendant-Appellant.*

No. 07-50120

D.C. No.
CR-03-00761-
RSWL-1

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

                    v.

WILLIAM PETERSON, aka BILL
PETERSON,

          *Defendant-Appellant.*

No. 07-50146

D.C. No.
CR-03-00761-
RSWL-02

OPINION

Appeal from the United States District Court
for the Central District of California
Ronald S.W. Lew, District Judge, Presiding

Argued and Submitted
June 12, 2008—Pasadena, California

Filed August 13, 2008

Before: Stephen S. Trott, Kim McLane Wardlaw, and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Trott

10489

**COUNSEL**

William J. Genego, Jr., Nasatir, Hirsch, Podberesky, & Genego, Santa Monica, California, and Paul L. Hoffman, Harris & Hoffman, LLP, Venice, California, for the defendants-appellants.

William A. Crowfoot, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

**OPINION**

TROTT, Circuit Judge:

Defendants Paul and William Peterson ran a home building business in California. In the 1990s, they subsidized down

payments to home buyers and then submitted misleading gift letters to the Department of Housing and Urban Development ("HUD") falsely stating that a family member or friend of the buyer had provided the money for the down payment.

Defendants appeal their jury convictions for: 1) causing false material statements to be made in a matter within the jurisdiction of an agency of the United States, in violation of 18 U.S.C. § 1001; 2) aiding and abetting in the violation of § 1001, in violation of 18 U.S.C. § 2; and 3) conspiring to make such false statements, in violation of 18 U.S.C. § 371. They appeal also the district court's order of restitution in the amount of $1,258,775, imposed pursuant to 18 U.S.C. § 3663A.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm. We hold that although it would be preferable for district courts to use a definition of materiality tracking the language approved by the United States Supreme Court in *United States v. Gaudin*, 515 U.S. 506 (1995), in this case, the district court did not commit plain error by giving the jury instruction it did. We further hold that the false gift letters and the source of the down payment for HUD-insured loans were material to HUD. Finally, we hold that Defendants' actions were the actual and proximate cause of HUD's losses, and we affirm the restitution order for the full amount of HUD's loss.

# I

## BACKGROUND

A. *HUD Requirements*

By insuring Federal Housing Administration ("FHA") mortgages, HUD assists homebuyers who cannot otherwise afford to purchase homes. FHA mortgage insurance insures the mortgage for the lenders, and if the buyer cannot make payments, HUD pays off the loan and takes the property. By

law, the buyer must meet three conditions before HUD will insure the loan: 1) sufficient income to make the monthly payments; 2) satisfactory credit rating; and 3) the ability to make a three-percent minimum cash investment in the property.[1] *See* 12 U.S.C. §§ 1709, 1715b.

Under HUD's regulations and policies, the buyer is not required to have the down payment come out of his or her own pocket—he or she may receive the down payment as a gift from friends, relatives, or non-profit housing assistance organizations. However, the sellers of the property are not permitted to make direct gifts to the buyers.

Despite this restriction on sellers, the seller was permitted indirectly to subsidize the down payment by providing money to a non-profit organization.[2] Under the permissible indirect subsidy scheme, after the non-profit approved a buyer, the non-profit agreed to gift the down payment at closing. The gift was paid out of the non-profit's own funds, and only after closing did the seller pay the non-profit a "service fee" equal to the gift from the proceeds of the sale. If the closing did not go through, the seller was not required to pay the service fee. The fee was used by the non-profit to provide gifts to *future* home purchasers.

---

[1]Although the cash investment is not technically a down payment, we refer to it as such for simplicity's sake.

[2]In October 2007, HUD promulgated a new regulation providing that FHA will no longer insure loans originated with seller-funded down payment assistance, whether that assistance is direct or indirect. *See Standards for Mortgagor's Investment in Mortgaged Property*, 72 Fed. Reg. 56,002, 56,002 (Oct. 1, 2007). Two district courts have concluded that HUD's promulgation of the October 2007 regulation violated the Administrative Procedure Act. *See Nehemiah Corp. of America v. Jackson*, 546 F. Supp. 2d 830 (E.D. Cal. 2008); *Penobscot Indian Nation v. United States Dep't of Housing and Urban Dev.*, 539 F. Supp. 2d 40 (D.D.C. 2008). We express no view about the merits of those decisions or HUD's subsequent attempt to promulgate similar regulations. *See Standards for Mortgagor's Investment in Mortgaged Property: Additional Public Comment Period*, 73 Fed. Reg. 33,941 (June 16, 2008).

Buyers who received the down payment money from an outside source, such as a family member, friend, or non-profit, were required to submit a gift letter to HUD. The gift letter confirmed the source of the gift, the relationship of the donor to the donee, and the nature of the buyer's down payment. A copy of the cashier's check delivering the gifted funds to escrow was attached also to the gift letter. The gift letter was put into a binder compiling details on the loan.

At the Petersons' trial, the government's expert, Travis Pham, Chief of the Insuring and Underwriting Division of HUD, testified that the government relied on the information in the binder, including the gift letter, to determine whether it would insure a loan and for auditing purposes. Pham was offered as an "expert on HUD regulations and policies related to underwriting" without objection by the Petersons. He said that HUD would not insure a loan if the binder contained a false gift letter: the down payment could come from the buyer's friends, relatives, or a non-profit, but "money can't go directly from the seller to the buyer." Pham further testified that requiring buyers to put 3% down gave the buyer some interest in the property, making it less likely that he or she would default. He explained that the limitations on who may give the buyer money existed also to prevent the seller from increasing the price.

## B.   *The Petersons' Scheme*

At the time of the trial, Paul and William Peterson ran a home building business called Peterson Land and Development ("PLD"). Their father started PLD, and he later brought Paul into the business. Paul became a FHA and HUD builder in the late 80s. Sometime in 1992 or 1994, William took over from their father as the sales manager for PLD.

At trial, Paul testified that in the early 1990s, he met many potential buyers who wanted to buy homes, had the employment, income, and credit to do so, "but just didn't have the

cash to get into the property." Paul testified that "[u]nder the FHA program, [he] knew that [he] could not give the buyer his down payment." He further testified that he spoke to a HUD construction analyst, Bob Hudgins, who told him that although the seller could not directly give the money to the buyer, he could give it to a relative because FHA did "not care where the donor gets the money." Called as a rebuttal witness by the government, Hudgins testified that he did not recall the conversation with Paul, but even if it had occurred, he could not have advised Paul regarding gift letters or mortgage requirements because he had no knowledge of those areas of HUD.

Paul testified that after he spoke to Hudgins, he concluded that he could lawfully assist potential buyers by taking money from PLD's profits and subsidizing the down payments. To facilitate this plan, the Petersons purchased a cashier's check in the name of a third party designated by the buyer. The third party never had possession or control of the gifted funds. The Petersons then deposited the cashier's check into escrow and submitted a gift letter to HUD stating that the third party was the donor of the gifted down payment. Paul testified that the buyer took the gift letter and had it filled out and signed by the bogus donor. As the sales manager, William was responsible for retrieving the gift letters and explaining that the donor on the gift letter would not actually have to provide any money.

Testimony of one of the buyers ("MM") and the parties listed on his gift letter ("Fisher Gift Letter") contradicted Paul's testimony about how the gift letters were obtained. MM testified that he did not have his parents (the purported donors) sign the gift letter. MM's parents testified that the signatures of their names on the gift letter were forgeries, and that they did not provide MM with any financial assistance for the purchase.

Defendants put up the down payment money for numerous transactions between 1993 and 1998. Several buyers for

whom Defendants directly funded the down payment later defaulted on their mortgage payments, leading to foreclosure. HUD assumed repayment of the loans.

C. *Procedural History*

Count One of the second superceding indictment charged Defendants with conspiracy to violate 18 U.S.C. § 1001 in violation of 18 U.S.C. § 371. Count Two charged Defendants with: 1) violating 18 U.S.C. § 1001(a)(3); and 2) aiding and abetting the commission of a federal crime under 18 U.S.C. § 2.

Section 1001(a)(3) establishes criminal penalties for anyone who, in a matter within the jurisdiction of a federal agency, "makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." 18 U.S.C. § 1001(a)(3).

On January 17, 2006, the Petersons' jury trial commenced. On January 19, Defendants moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the source of the money was immaterial to HUD. The judge denied the motion.

At the government's request, the district court gave Ninth Circuit Model Criminal Jury Instruction 8.66 on materiality: "[a] statement is material if it could have influenced the agency's decisions or activities." Paul objected to the instruction, arguing that the model jury instruction was too broad because there could be a "situation [where] there is an immaterial or irrational application or statement that the bureaucracy of the government requires, that the person could have submitted a statement to them that was totally immaterial [and] unrelated to the program, purposes or concerns." Paul proposed an alternative jury instruction: "a statement is material if it's important or significant to the Government program to which it was submitted." The court rejected the proposed instruction.

The jury found both Defendants guilty on both counts of the indictment. The Pre-Sentence Report recommended restitution in the amount of $1,258,775. The recommendation was based on a report by Chris Hyun, a forensic auditor with HUD. Hyun calculated a restitution amount for each property equal to the difference between the appraised value of the property at the time of conveyance to HUD and HUD's expenses in making good on the lender's mortgage insurance claim. The report did not attribute to the Petersons additional losses resulting from discounts or rebates HUD provided to the purchasers of foreclosed properties. Defendants objected to the requested amount of restitution, arguing that the "contribution of the down payments did not proximately cause the homeowners to fail to make their mortgage payments." The district court disagreed with Defendants and determined that they were the proximate cause of the loss. It ordered restitution in the full amount requested by the government for the loss incurred by HUD.

## II

## DISCUSSION

The Petersons present three arguments for our consideration: 1) the jury instruction was erroneous because it misstated the element of materiality; 2) the evidence was insufficient to support a determination that the false gift letters were material to HUD; and 3) the restitution order was erroneous because the government failed to present evidence that Defendants' false statements were the direct and proximate cause of the loss. We address each in turn.

A.  *Jury Instruction*

1.  *Standard of Review*

We typically review de novo whether a jury instruction misstates an element of a crime, and we review for abuse of

discretion a district court's formulation of an instruction. *United States v. Dearing*, 504 F.3d 897, 900 (9th Cir. 2007). However, "[i]n the absence of a timely objection to the jury instructions, we review for plain error." *United States v. Moran*, 493 F.3d 1002, 1009 (9th Cir. 2007) (per curiam). *See also United States v. Nash*, 115 F.3d 1431, 1437 (9th Cir. 1997) ("*Gaudin*-type errors not asserted at trial should be reviewed for plain error pursuant to Fed. R. Crim. P. 52(b) . . . .").

"A party who objects to any portion of the instructions or to a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." FED. R. CRIM. P. 30(d). "Rule 30 . . . requires that a defendant object with adequate specificity—an objection must state distinctly the matter to which the party objects as well as the grounds of the objection. A defendant's mere proposal of an alternate instruction does not satisfy Rule 30's standard of specificity." *United States v. Elias*, 269 F.3d 1003, 1017-18 (9th Cir. 2001) (quoting *United States v. Klinger*, 128 F.3d 705 (9th Cir. 1997)).

An examination of the record reveals that Defendants objected to the jury instruction on different grounds below than they do on appeal. At trial, Paul offered the following objection:

> The objection is basically . . . as to line 19 and 20, and [the government's] instruction says, a statement is material if it could have influenced the agency or activities. The opposite instruction that's offered by [Defendants] is a statement is material if it's important or significant to the Government program to which it was submitted. . . . The Ninth Circuit instruction, it sort of could have a situation [where] there is an immaterial or irrational application or statement that the bureaucracy of the government

requires, that the person could have submitted a statement to them that was totally immaterial [and] unrelated to the program, purposes or concerns . . . .

In other words, Defendants believed that the FHA's insistence that down payment funds not come directly from the seller was irrational in terms of the insurance program's purposes (because FHA allowed equally pernicious indirect seller subsidies through non-profits), and consequently that the identity of the funds' source was "immaterial."[3]

In contrast, on appeal, Defendants argue that the proper materiality instruction is: "The statement must have a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." *See Gaudin*, 515 U.S. at 509 (internal quotation marks omitted). The requested instruction on appeal does not focus on the rationality of the agency's decisionmaking process, as did the requested instruction below. Rather it focuses on whether the statement is capable of influencing the agency's decision. Consequently, we review for plain error.

## 2. *Discussion*

We hold that although it would be preferable for district courts to use the definition of materiality approved by the Supreme Court in *Gaudin*, in this case, the use of the Ninth Circuit Model Jury Instruction was not plain error.

---

[3]This interpretation of Defendants' objection to the materiality of the jury instruction is further supported by their Rule 29 motion for a directed verdict of acquittal. There they argued that the "gift letter demonstrates that there is no materiality" because Pham's testimony showed that "not only does the Government not care [that the funds are] coming from the seller, but they have consciously blinded themselves to where it's coming from." All of the nonprofit transactions approved by FHA established that "this type of a transaction where the seller gives it to the buyer . . . is total immateriality [sic]." The "legal fiction of saying that the money is different that comes than goes out" of a nonprofit's general funds "prove[s] . . . [that the gift letters were] never material."

Plain error review requires us to find "(1) an error that is (2) plain and (3) affects substantial rights. Even if these conditions were met, we may only exercise our discretion to correct the error if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' " *Nash*, 115 F.3d at 1437 (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997). A jury instruction is not plainly erroneous if it is "substantially similar" to another permissible instruction. *United States v. Johnson*, 297 F.3d 845, 866-67 n.21 (9th Cir. 2002).

**[1]** The Supreme Court has explained that the customary common law test for materiality in false statement statutes such as § 1001 is whether the statement "has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Kungys v. United States*, 485 U.S. 759, 770 (1988) (internal quotation marks omitted). Subsequently, in *Gaudin*, the Supreme Court reaffirmed the definition of materiality that it applied in *Kungys*. *See Gaudin*, 515 U.S. at 509; *see also United States v. Tarallo*, 380 F.3d 1174, 1190 (9th Cir. 2004).

Defendants argue that the district court's instruction was erroneous, and that the *Gaudin* instruction should have been given for two reasons. First, they argue that the "could have" portion of the jury instruction was erroneous because it broadened the scope of materiality. Under the facts in this case, this argument fails.

**[2]** The difference between "could have influenced" and "capable of influencing," is sufficiently nebulous that our sister circuits have sometimes used the "could have" language in post-*Gaudin* opinions.[4] Furthermore, "capable of influencing"

---

[4]*See, e.g., United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008) ("[T]he form's materiality depends on whether it *could have influenced* the government's decision to award Task Order 43 to KBR.") (emphasis added); *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) ("Instead [the defendant] argues that the omis-

is an objective test, which looks at "the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end." *United States v. Facchini*, 832 F.2d 1159, 1162 (9th Cir. 1987); *see also Kungys*, 485 U.S. at 771 (equating "predictably capable of affecting" with "ha-[ving] a natural tendency to affect"). "Could have influenced" likewise looks at a statement's intrinsic capacity to influence, not its probability of causing influence. As the Supreme Court has said in a different context, "the use of the word 'could' focuses the inquiry on the power of the trier of fact," not on "likely behavior" or "probabilistic" matters. *See Schlup v. Delo*, 513 U.S. 298, 330 (1995) (distinguishing "could have convicted" from "would have convicted").

[3] Thus, because "could have influenced" is "substantially similar" to the "capable of influencing" language in the *Gaudin* instruction, we conclude there is not plain error here. *See Tarallo*, 380 F.3d at 1190.

Defendants' second argument regarding the given jury instruction turns on the inclusion of the word "activities." Here, they argue that a statement could be deemed material even if it was completely incapable of influencing a decision the agency was trying to make. This argument fails because the plain language of the given instruction does not permit a finding of materiality based solely on the utterance of a false statement. Rather, under the given instruction, the jury was required to find that the false statement could have actually resulted in a change in position by the agency. Again, this is "substantially similar" to the *Gaudin* instruction. Consequently we conclude that the given jury instruction was not

sions were not material . . . . The question is . . . whether the omission *could have influenced* the agency's decision.") (emphasis added); *United States v. DiRico*, 78 F.3d 732, 736 (1st Cir. 1996) ("The government need only prove to the jury . . . that the alleged false statement at issue *could have influenced or affected* the IRS . . . .") (emphasis added).

plain error under the specific facts of this case. *See Tarallo*, 380 F.3d at 1190.

B. *Sufficiency of the Evidence*

Defendants argue that their convictions must be vacated because there is insufficient evidence as a matter of law to support a conclusion that the source of the down payment was material to HUD's decision to insure the loan. We disagree.

1. *Standard of Review*

There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

2. *Discussion*

a. *Count Two, Violations of §§ 1001 and 2*

[4] "A conviction under § 1001 requires the government to prove (1) a statement, (2) falsity, (3) materiality, (4) knowledge, and (5) jurisdiction." *United States v. Atalig*, 502 F.3d 1063, 1066 (9th Cir. 2007). "The jury is the finder of fact and is entitled to believe or disbelieve the testimony of the department officials." *United States v. Gaudin*, 28 F.3d 943, 950 (9th Cir. 1994) (en banc), *aff'd*, 515 U.S. 506.

Defendants contest only the materiality of the false gift letters and the source of the down payment. We hold that Pham's testimony could have led a rational trier of fact to conclude that the false gift letters and the source of the down payment were material to HUD.

[5] Pham testified that HUD would not insure a loan if the case binder contained a false gift letter. Pham further testified

that "we need to know who the donor is and . . . the relationship between the donor and the buyer, and how much the gift was for, and how the money was transferred and where it was from." A reasonable juror could have concluded that the false statements in the Fisher Gift Letter were material because, had HUD known that the Petersons directly funded the down payment, HUD would not have insured the loan. *See United States v. Mayberry*, 913 F.2d 719, 723 (9th Cir. 1990) (concluding that the testimony of a HUD administrator that the information at issue was "highly significant in reviewing mortgage insurance applications" was sufficient to establish materiality).

Defendants make much of the fact that a non-profit could fund the down payment, and the seller could donate money to the non-profit, arguing that what mattered to HUD was not the source of the down payment, but whether or not it was made. However, this argument ignores Pham's testimony that HUD's policies did not permit the seller to gift the money directly to the buyer.

The distinction Pham articulated between direct and indirect gifts did not stem from the idiosyncratic predilections of any one approving officer. Rather, the requirements were established rules and regulations of HUD—a clear indication that the statements in the gift letters as to the source of the down payment were predictably capable of influencing HUD's decisions.[5]

---

[5]Although Pham recognized that there was a "very good possibility" that the permissible indirect subsidies might implicate many of the same concerns as the forbidden direct seller subsidies, the materiality requirement in false statement cases does not turn on whether the agency's regulatory distinctions are wise or consistent as a matter of policy; it contains no embedded question of substantive reasonableness. *Cf. Tarallo*, 380 F.3d at 1190 (rejecting the argument that "materiality" depends on whether a statement is "important to the decision-making process" of a "reasonable person").

Furthermore, it is undisputed that HUD has always prohibited direct gifts from sellers. *See Standards for Mortgagor's Investment in Mortgaged Property*, 72 Fed. Reg. 27,048 (May 11, 2007); *Sources of Homeowner Downpayment*, 64 Fed. Reg. 49,956 (Sept. 14, 1999); HUD Mortgagee Letter 91-9 (1991). In fact, Paul himself recognized that "under the FHA program . . . [he] could not give the buyer his down payment."

**[6]** As a result, we hold that there was sufficient evidence for a reasonable juror to conclude that the gift letters and the source of the down payment were material to HUD.

### b. *Count One, Conspiracy to violate § 1001*

Defendants were convicted also of violating 18 U.S.C. § 371, which provides:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371.

**[7]** In support of their argument that the evidence was insufficient for their conspiracy convictions, Defendants merely reiterate that the statements made with respect to Count Two were not material. Because sufficient evidence supports the convictions for Count Two and because Defendants raise no other argument with respect to the conspiracy convictions, we hold that sufficient evidence supports the conspiracy convictions.

### C. *Restitution*

Defendants raise two arguments challenging the district court's order of restitution in the amount of $1,258,755: 1) the

government presented no evidence that Defendants' crimes directly or proximately caused the losses; and 2) the district court did not make any factual findings to support the restitution order.

### 1.   *Standard of Review*

We review de novo the legality of a restitution order and, if the order is within the statutory bounds, we review the amount of restitution for abuse of discretion. *United States v. Phillips*, 367 F.3d 846, 854 (9th Cir. 2004) (as amended). We review for clear error factual findings supporting an order of restitution. *United States v. Berger*, 473 F.3d 1080, 1104 (9th Cir. 2007).

### 2.   *Causation*

**[8]** Restitution in this case is governed by the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. "The MVRA requires a defendant to pay restitution to a victim who is 'directly and proximately harmed as a result of' the fraud." *Id.* at 1104 (quoting 18 U.S.C. § 3663A(a)(2)). A victim "is a person who has suffered a loss caused by the specific conduct that is the basis of the offense of conviction." *United States v. Gamma Tech Indus. Inc.*, 265 F.3d 917, 927 (9th Cir. 2001) (quotation marks omitted). "The government has the burden of establishing by a preponderance of the evidence that the victim's damages were caused by the conduct of which the defendant was convicted." *United States v. Rice*, 38 F.3d 1536, 1540 (9th Cir. 1994); *see also* 18 U.S.C. § 3664(e).[6]

**[9]** Restitution may compensate victims only "for actual

---

[6]Rice considered restitution under the Victim and Witness Protection Act ("VWPA"). With exceptions inapplicable here, the VWPA and the MVRA "are identical in all important respects, and courts interpreting the MVRA may look to and rely on cases interpreting the VWPA as precedent." *United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004).

losses caused by the defendant's criminal conduct." *Gamma Tech Indus.*, 265 F.3d at 926.

> Defendant's conduct need not be the sole cause of the loss, but any subsequent action that contributes to the loss, such as an intervening cause, must be directly related to the defendant's conduct. The causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable.

*Id.* at 928 (citations omitted). The "main inquiry for causation in restitution cases [is] whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct." *Gordon*, 393 F.3d at 1055 (quoting *United States v. Meksian*, 170 F.3d 1260, 1263 (9th Cir. 1999).

We recently addressed the issue of proximate cause in the context of restitution for misreporting of financial information. *Berger*, 473 F.3d 1080. In *Berger*, the defendant falsified Borrowing Certificates by overstating assets and accounts receivable. *Id.* at 1105. As a result of the falsified statements, several banks loaned "millions of dollars to [the defendant's business] based on either nonexistent or substantially overstated collateral." *Id.* at 1085. After a jury convicted the defendant, the district court imposed a sentence of six months in prison and ordered the defendant "to pay the lending banks $3.14 million in restitution." *Id.* at 1089.

On appeal, the defendant challenged the restitution order, arguing that the lending banks' losses were not traceable to the fraudulent Borrowing Certificates, but rather to unrelated financial difficulties. *Id.* at 1104, 1107. We disagreed, first observing that "[t]he information in the Borrowing Certificates was vital" because the defendant's "fraudulent overstatement would, and did, cause the lending banks to advance more money than" they otherwise would have. *Id.* at 1107. We continued:

> [The defendant] is probably correct to note that [his business'] financial troubles [and a downturn in the electronics market] ultimately led to the loan *default*. He has not demonstrated, however, that external factors were completely to blame for the lending banks' *losses*. Even if the default were inevitable, the high amount of the lending banks' losses was not. Had [the defendant] not fraudulently stated [his business'] assets on the Borrowing Certificates, the amount of outstanding debt would have been smaller. That fact was taken into account by the district court, which did not attribute the lending banks' entire loss to the fraud. Instead, the district court properly focused only on the amount of loss attributable to the falsified Borrowing Certificates.

*Id.* Here, if the Petersons had not falsely stated that they were directly the source of the down payments, then the FHA would not have insured the defaulted mortgages and would have suffered no losses whatsoever.

Similarly, we have upheld restitution orders even where there are multiple links in the causal chain. *United States v. Hackett*, 311 F.3d 989 (9th Cir. 2002). In *Hackett*, we held that a defendant who pled guilty to aiding and abetting methamphetamine manufacture could be ordered to pay restitution to an insurance company for property damage caused when a co-defendant started a fire by placing a jar of chemicals used to manufacture methamphetamine on a hot plate. *Id.* at 992-93. The defendant obtained supplies that his co-defendants later used to manufacture methamphetamine, and he had "knowledge and understanding of the scope and structure of the enterprise and of the activities of [his co-defendants]." *Id.* at 993. We recognized that there were "multiple links in [the] causal chain," but still held that the defendant's conduct was directly related to the resulting loss. *Id.*

Under a different statutory scheme, one of our sister circuits addressed the proximate cause issue under similar fac-

tual circumstances to the scheme used by the Petersons. *See United States v. Spicer*, 57 F.3d 1152 (D.C. Cir. 1995). In *Spicer*, the defendant was convicted of fraud for submitting documents that "intentionally overstated the down payment made by a home buyer in order to help the buyer qualify for an FHA-insured mortgage." *Id.* at 1154 & n.1. "[T]he fraud conviction was predicated upon a single transaction . . . [but the defendant] admitted in factual stipulations that he had made similar misrepresentations on a total of 81 applications for FHA-insured mortgages." *Id.* at 1154. Many of these buyers "subsequently defaulted, resulting in losses of $1.8 million to HUD." *Id.*

The court of appeals agreed with the defendant "that proof that his misrepresentation proximately caused harm to the government is required in order to establish the fraudulent nature of his debt" for the purpose of the Bankruptcy Code. *Id.* at 1159. However, the court affirmed the district court's conclusion that the defendant's "misrepresentations proximately caused HUD's losses." *Id.* at 1160. The court of appeals explained:

> [The defendant's] misrepresentations were material to HUD's determination that the mortgage applicants met the financial requirements to qualify for FHA-insured mortgages and had a sufficient personal financial stake in the properties to have the proper incentives to avoid default. The misrepresentations were thus more than a "but-for" cause; they proximately caused HUD's losses when the buyers to whom HUD improvidently granted FHA-insured mortgages on the basis of [the defendant's] misrepresentations of their financial qualifications defaulted. The defaults were thus a foreseeable consequence of [the defendant's] conduct. It is undoubtedly true that in each case other factors also "caused" the buyer's default, but that is of no moment, for as long as [the defendant's] misrepre-

sentations were a material and proximate cause, they need not have been the sole factor causing HUD's losses.

*Id.* at 1159. The court further explained:

> It is undisputed that [the defendant] intentionally misrepresented buyers' downpayments in order to induce HUD to approve FHA-insured mortgages for parties who otherwise would not qualify; without evidence of adequate down payments, HUD would have rejected the applications, calculating the risk of default too high. HUD went for [the defendant's] bait, and suffered massive losses when those buyers subsequently defaulted. Viewing all the evidence in the light most favorable to [the defendant], we think a rational factfinder could only conclude from the undisputed facts that [the defendant's] misrepresentations did indeed proximately cause HUD's losses.

*Id.* at 1160.

Here, the district court ordered the full amount of restitution requested by the government for the loss incurred by HUD for forty-three FHA insured loans. At sentencing, the district court made the following statements:

> I am going to take the full amount of restitution—that is the loss—in violation of the two counts. There may be other contributing factors, as you well argued, and I accept that. But this is not a tort case where I am going to divide it. In the first instance, you are found culpable, and in that first instance you should remain liable for the restitution amount.

The district court further stated: "With respect to the argument made by attorneys as to the proximate cause for the 43 foreclosures, I find clearly that the defendants' actions cer-

tainly did put the government into that position for the higher risk, so that is the finding."

Defendants argue that the district court erred because the losses to HUD were caused not by the fraudulent gift letters, but by intervening events. Specifically, they argue that the defaults were caused by the home-buyers' inability to repay the loans due to increased interest rates, inability to maintain employment, and decreased paychecks. We disagree with Defendants that these events preclude a conclusion that Defendants were the direct and proximate cause of the losses to HUD.

**[10]** Our analysis of our own case law as well as that of our sister circuits leads us to conclude that despite the multiple links in the causal chain, the Petersons directly and proximately caused the losses to HUD. As in *Berger, Hackett*, and *Spicer*, the causal chain here is not extended so far as to become unreasonable. The evidence at trial showed that Defendants sold forty-three properties and directly provided down payment assistance along with the false gift letters. Each of those houses went into foreclosure. Without the down payment, the buyers would not have been eligible for FHA insured mortgages and could not have later defaulted on their payments because they never would have been able to qualify for HUD financing. The Petersons enabled unqualified buyers to obtain loans; those unqualified buyers subsequently defaulted. Thus, the very concern targeted by the prohibition against direct seller subsidies—that buyers who could not meet the 3% down payment requirement would have an inadequate incentive to avoid default—was exactly what eventuated.

### 3. *Factual Findings*

Defendants argue that the district court did not make any factual findings in ordering restitution and that "there was no basis on which the court could make findings of fact sufficient

to support the order as the government presented no evidence that the defendants' crimes directly and proximately caused the loss."

**[11]** Nothing in the MVRA or our case law requires that the district court consider certain factors or make findings of fact on the record. *See* 18 U.S.C. § 3663A. Furthermore, as we discussed above, the government did present evidence that Defendants directly and proximately caused the loss. The government presented a declaration from Hyun listing forty-three different HUD-insured properties for which Defendants had subsidized the down payments. Each of those houses went into foreclosure, resulting in a loss to HUD. Hyun's declaration and report on the losses documented the specific loss amount for each property. Although the district court did not specifically make any findings, it is clear that it relied on Hyun's declaration and the testimony at trial in reaching its conclusion as to the amount of the restitution.

## III

## CONCLUSION

For the above reasons, we affirm the district court's sentence and restitution order.

**AFFIRMED.**