**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

NICHOLAS LINDSEY,
*Defendant-Appellant.*

No. 14-10004

D.C. No.
2:11-cr-00217-
LDG-CWH-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Lloyd D. George, Senior District Judge, Presiding

Argued and Submitted March 18, 2016
San Francisco, California

Filed February 27, 2017

Before: Susan P. Graber,* Ronald M. Gould,
and Michelle T. Friedland, Circuit Judges.

Opinion by Judge Gould

---

\* After oral argument in this case, and our former opinion and memorandum disposition filed June 28, 2016, and after the petition for rehearing or rehearing en banc was filed on August 19, 2016, Judge Graber on January 26, 2017, replaced Judge Noonan on this panel.

## SUMMARY[**]

### Criminal Law

The panel affirmed convictions in a mortgage fraud case.

The panel held (1) negligence is not a defense to wire fraud, and evidence of lender negligence is not admissible as a defense to mortgage fraud; (2) intentional disregard of relevant information is not a defense to wire fraud, and evidence of intentional disregard by lenders is not admissible as a defense to mortgage fraud; (3) evidence of individual lender behavior is not admissible to disprove materiality, but evidence of general lending standards in the mortgage industry is admissible to disprove materiality; and (4) the district court did not deny the defendant the opportunity to present a complete defense.

The panel addressed other contentions in a concurrently-filed memorandum disposition.

### COUNSEL

William H. Gamage, Gamage & Gamage, Las Vegas, Nevada, for Defendant-Appellant.

Peter S. Levitt (argued), Assistant United States Attorney; Elizabeth O. White, Appellate Chief; Daniel G. Bogden,

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

United States Attorney; United States Attorney's Office, Las Vegas, Nevada; for Plaintiff-Appellee.

Heather E. Williams, Federal Defender for the Eastern District of California; Hilary Potashner, Federal Defender for the Central District of California; Ann C. McClintock, Assistant Federal Defender; Office of the Federal Public Defender, Sacramento, California; Michael Tanaka, Deputy Federal Public Defender, Office of the Federal Public Defender, Los Angeles, California; Karen Lee Landau, Law Office of Karen Landau, Oakland, California; Barry L. Morris, Walnut Creek; for Amicus Curiae Federal Defenders for the Central and Eastern Districts of California.

## OPINION

GOULD, Circuit Judge:

We address the admissibility of certain evidence in this criminal mortgage fraud case. We affirm the convictions, rejecting appellant's contentions that evidence was improperly excluded and that he was denied the ability to present a defense. In a separate memorandum disposition filed concurrently, we reject other challenges to the convictions and some challenges to the sentence.

Nicholas Lindsey, a former mortgage loan officer and real estate broker, appeals his convictions and sentence for nine counts of wire fraud and one count of aggravated theft. For several years, Lindsey was involved in a complex mortgage fraud scheme that involved convincing individuals to "buy" residential properties in exchange for financial assistance. In some cases, Lindsey built up these individuals' credit ratings

and deposited money into their bank accounts in order to fraudulently secure mortgages. He also submitted falsified loan documents to lenders in order to make the individuals appear more creditworthy, including falsely stating the applicants' earned income. The properties secured through this scheme were destined for foreclosure, creating large losses for financial institutions[1] while Lindsey benefitted financially from commissions, rent payments, and diverted escrow monies.

Lindsey was charged with wire fraud under 18 U.S.C. § 1343, which requires the Government to prove that the defendant made "material" fraudulent representations, *i.e.*, representations that had "a natural tendency to influence, or [were] capable of influencing" the decisions of the lenders who made the loans. *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)); *Neder v. United States*, 527 U.S. 1, 16 (1999). At his trial, the district court precluded Lindsey from presenting certain evidence regarding the practices of particular lenders. He appeals his convictions on the ground that he was denied his constitutional right to present a defense. We have jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, and we hold that lender negligence in verifying loan application information, or even intentional disregard of the information, is not a defense to fraud, and so evidence of such negligence or intentional disregard by

---

[1] As reflected in the Presentence Report and as testimony at sentencing indicated, the loans and/or properties at issue in this case appear to have been purchased from the original lender by a second financial institution. Thus the victims in this case—at least for the purposes of restitution—are the second financial institutions that suffered losses at the time of foreclosure, not the original lenders.

particular lenders is inadmissible as a defense against charges of mortgage fraud. We also hold that evidence of the general lending standards applied in the mortgage industry is admissible to disprove materiality, but evidence of individual lender behavior is not admissible for that purpose.

**I**

Lindsey worked for Clear Mortgage, Inc., in Nevada as a mortgage loan officer and team leader for a mortgage group. From about May 2006 to June 2007, while employed with Clear Mortgage, Lindsey recruited straw buyers for Las Vegas real estate and, in the process, made false statements in loan applications. In one illustrative example presented at trial, Lindsey recruited Madelon Bridges, a woman living in Louisiana with only $50 to her name, to "purchase" Villa Del Mar, a house in Las Vegas worth $720,000. Lindsey flew Bridges to Las Vegas and promised to pay off her debt and give her $10,000 in exchange for acting as a straw buyer. Bridges gave Lindsey her personal identification information, including her social security number and fingerprints, and Lindsey paid off her debt and transferred money into her bank account. Lindsey also had Bridges sign a loan application that falsely represented, *inter alia*, that she intended to live at the property she was applying for a loan to purchase, paid $3,300 a month in rent, was gainfully employed, and had a sizeable bank account. After she was approved for the loan, Lindsey used Bridges's personal information to apply for another loan and purchase another home in her name without her knowledge. When Lindsey did not make mortgage payments as promised, Villa Del Mar went into foreclosure, negatively affecting Bridges's credit rating and causing losses to the lender. Lindsey perpetrated similar frauds with five straw buyers—including his sister—on nine home loans and

eight different properties. From this scheme, Lindsey profited by receiving significant commissions, rent payments, and diverted escrow monies.

Lindsey was arrested and indicted on nine counts of wire fraud under 18 U.S.C. § 1343 and one count of aggravated identity theft under 18 U.S.C. § 1028A. Before trial, the Government suspected that Lindsey was planning to defend himself by claiming that the lenders were at fault for failing to verify the information in the fraudulent loan applications. The Government filed a motion *in limine* to prevent Lindsey from introducing evidence of lender negligence. The district court declined to rule on the issue, concluding that a final ruling "would be more appropriately made in the context of the development of the evidence at trial."

During opening statements at trial, the district court warned Lindsey's attorney to "stay away" from the issue of lender negligence. Nevertheless, Lindsey's counsel described 2006 to 2007 as "a wild time" of mortgage lending, one that he had once referred to as the "Wild West." It was a period, counsel said, when "there were mortgages being offered that had never been offered before and perhaps may never be offered again." These mortgages included "stated income" and "no income, no assets"[2] loans. The Government objected to defense counsel's description of the loan products, arguing that it was evidence of lender negligence. The district court

---

[2] Lindsey's counsel urged in the opening statement that a "stated income" loan "means that the lender will rely on the borrower to state their income and state their assets," and that a "no income, no assets" loan means that "the lender did not appear to know about the income or assets on that particular loan." On appeal, Lindsey describes "the stated/no doc loan type as a loan that banks offered [] which allowed applicants to provide no back up documentation for their income and assets."

allowed the description of the loans, but warned counsel again to "stay away" from suggesting negligence. The district court subsequently told the parties that it was "inclined" to exclude evidence of lender negligence from the rest of trial.

Lindsey's counsel later cross-examined a Government witness about the state of the mortgage industry at the time of Lindsey's alleged fraud. The witness testified that both "stated income" and "no document" loans were common at the time. Lindsey's attorney then got more specific, asking the witness about previous bad loans that her employer, a lender, had provided. The Government objected. During a sidebar the prosecutor argued that the district court had already ruled on the issue of lender negligence, and so defense counsel's question was irrelevant. The district court sustained the objection.

In cross-examining another Government witness, Lindsey's counsel asked about two loan applications that the witness, a former employee of a lender, had previously approved. The applications were for the same property, but the bank account information in the applications differed. Lindsey's counsel asked whether this meant that one of the applications was false, and how the witness would have responded to such an inaccuracy. The Government objected, arguing that Lindsey's attorney was again eliciting evidence of lender negligence, and the district court again sustained the objection.

During closing arguments, the district court allowed defense counsel, over the Government's objections, to say that "[i]n 2006 and 2007 America was on a mortgage loan high." He was allowed to say that loans went bad because of

"[e]asy lending practices" and because "100 percent financing of a mortgage on stated income and stated assets" allowed "people [to buy] houses they could not afford." Defense counsel also said that, at the time, buyers and sellers of real estate were "extremely busy," making money very quickly, and would sometimes make mistakes or "do things on purpose just to close a deal."

In charging the jury, the district court included an instruction stating that "[l]oose lending practices do not constitute a defense to wire fraud, but the lending standards applied by the financial institutions that lent the money in this case are relevant to the question of materiality."

The jury convicted Lindsey of all counts. The district court sentenced Lindsey to consecutive sentences of 108 months for wire fraud and 24 months for identity theft, for a total of 132 months. The court also imposed $2,286,911 in restitution. Lindsey timely appealed.

## II

To convict a defendant of wire fraud, the jury must find beyond a reasonable doubt: "(1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud." *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013). In order to prove a "scheme to defraud," the jury must find that the defendant employed "*material* falsehoods." *Neder*, 527 U.S. at 20. "In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* at 16 (alteration in original) (quoting *Gaudin*, 515 U.S. at 509).

The element of materiality is evaluated under an objective test, in which we must examine "the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end." *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (internal quotation marks omitted). "To be material a statement need only have the propensity or capacity to influence or affect [a lender's] decision." *United States v. Rodriguez-Rodriguez*, 840 F.2d 697, 700 (9th Cir. 1988). Stated differently, "the government does not have to prove actual reliance upon the defendant's misrepresentations" to satisfy materiality. *Neder*, 527 U.S. at 25 (quoting *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989)).

Lindsey contends that the district court erred by barring him "from challenging the materiality of false statements on a loan type that invites the applicant to state their income without justification or support." According to Lindsey, this prevented him from presenting a complete defense, a right that is constitutionally protected. *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." (internal quotation marks omitted)). We review *de novo* a district court's decision to preclude a defendant's proffered defense. *See United States v. Forrester*, 616 F.3d 929, 934 (9th Cir. 2010).

Whether trial courts may admit evidence of a lender's decision-making process—including evidence that a lender has been careless in approving underserving loans, or even intentional in disregarding relevant information—is an issue that has been debated in this circuit's lower courts. *See United States v. Kuzmenko*, No. 2:11-CR-0210 JAM, 2014 WL 7140640, at *6 n.5 (E.D. Cal. Dec. 12, 2014)

(unpublished) (collecting cases and noting that "[w]hether, and to what extent, a jury must know about the lenders' decision-making process in a mortgage fraud prosecution would appear to be an issue over which reasonable minds might disagree").  We understand the desire to see lenders shoulder responsibility for their role in the mortgage crisis of the last decade.  *See Nevada v. Bank of Am. Corp*., 672 F.3d 661, 670–71 (9th Cir. 2012) ("The Center for Responsible Lending estimates that from 2009 to 2012, foreclosures on neighboring homes will result in lost home equity in nearly one million homes across Nevada, amounting to total lost home equity of $54.5 billion.  The city of Las Vegas has the second highest foreclosure rate in the nation.  Considering the devastating effect of the foreclosure crisis on Nevada, it is unsurprising that the Attorney General would exercise her statutory right to [prosecute deceptive trade practices by mortgage lenders]." (footnotes omitted)).  However, that does not mean that lenders can be victimized[3] by intentional fraudulent conduct with impunity merely because the lenders were negligent, or even because the lenders intentionally disregarded the information in a loan application.   Two wrongs do not make a right, and lenders' negligence, or even intentional disregard, cannot excuse another's criminal fraud.

Several of our sister circuits have held that a fraud victim's negligence is not a defense to criminal charges under the federal fraud statutes.  *See United States v. Colton*, 231 F.3d 890, 903 (4th Cir. 2000) ("The susceptibility of the

---

[3] We use the words "victimized" and "victim" in this context to describe the original lenders, while acknowledging that the entities that actually lost money in this scheme at the time of foreclosure—the victims in this case for the purposes of restitution—were those financial institutions that purchased the loans and/or collateral from the original lenders.

victim of the fraud, in this case a financial institution, is irrelevant to the analysis: If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright." (internal quotation marks omitted)); *see also United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) (en banc) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (per curiam) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for [the] substantive offense . . . ."); *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."); *United States v. Kreimer*, 609 F.2d 126, 132 (5th Cir. 1980) ("The victim's negligence is not a defense to criminal conduct.").

In *United States v. Ciccone*, we rejected the defendant's argument that the Government was required to prove that the defendant's fraud was calculated to defraud persons of ordinary prudence and comprehension. 219 F.3d 1078, 1083 (9th Cir. 2000). We held that "the wire-fraud statute protects the naive as well as the worldly-wise . . . . [T]he lack of guile on the part of those solicited may itself point with persuasion to the fraudulent character of the artifice." *Id.* (quoting *United States v. Hanley*, 190 F.3d 1017, 1023 (9th Cir. 1999), *superseded on other grounds by statute*). Although *Ciccone* discussed the elements of wire fraud, not permissible defenses, its reasoning is persuasive here. We join several of our sister circuits in holding that a victim's negligence is not a defense to wire fraud. Evidence of lender negligence is thus not admissible as a defense to mortgage fraud.

Lindsey maintains on appeal that he did not seek to introduce evidence of lender negligence at trial, but rather "evidence of the materiality of falsehoods that may have appeared on loan applications." Without saying so explicitly, Lindsey may be arguing in substance that he wanted to introduce evidence that his alleged victims were willing to approve the loans regardless of the information included in the application forms. This theory implies something more than lender negligence, and approaches intentionality.

But the intentional conduct of the lender cannot provide an effective defense based on alleged lack of materiality. A false statement is material if it *objectively* had a tendency to influence, or was capable of influencing, a lender to approve a loan. *See Peterson*, 538 F.3d at 1072; *Neder*, 527 U.S. at 16. This standard is not concerned with a statement's subjective effect on the victim, but only "the intrinsic capabilities of the false statement itself." *Peterson*, 538 F.3d at 1072. For this reason we have previously held that "misrepresentation may be material without inducing any actual reliance." *United States v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) (quoting *United States v. Halbert*, 640 F.2d 1000, 1009 (9th Cir. 1981) (per curiam)); *see also Neder*, 527 U.S. at 24–25 ("The common-law requirement[] of 'justifiable reliance' . . . plainly ha[s] no place in the federal fraud statutes.").

That the lenders here might have intentionally disregarded Lindsey's false statements has little relevance to whether those statements are intrinsically able to influence a decision. Again, materiality is an objective element, and an absence of reliance does not affect its presence. *See United States v. Reynolds*, 189 F.3d 521, 525 (7th Cir. 1999) ("Evidence that the bank would not have relied on [the defendant's]

representations, and instead would have made an exception for him, does not establish that the representations were immaterial . . . . [T]he proper inquiry addresses not the defendant's ability to influence, but rather the nature of the statements made."). We hold that a victim's intentional disregard of relevant information is not a defense to wire fraud and thus evidence of such disregard is not admissible as a defense to mortgage fraud. To the extent that Lindsey tried to introduce evidence of lenders' intentional disregard and the district court prevented him, the district court did not err.

Our holdings do not leave defendants powerless to challenge the materiality of false statements made in connection with securing mortgages. Among other things, defendants can disprove materiality through evidence of the lending standards generally applied in the mortgage industry. For example, defendants can offer testimony about the types of information, such as household income or assets, that lenders typically consider, as well as evidence of how much weight the industry generally gives to statements about such information. As long as defendants do not stray into evidence of the behavior of individual lenders—for instance, evidence of specific prior bad loans or particular mistakes by underwriters—defendants may attack materiality though industry practice.

To illustrate, suppose a defendant is charged with wire fraud for falsely stating on a loan application that he was married. In such a case, it would be admissible for a defense expert to testify that, while mortgage applications usually ask about marital status, the general practice in the industry is to ignore marital status when making lending decisions. The defendant could then argue in closing that his false statement about marriage was immaterial, and so the elements of wire

fraud have not been proven. By contrast, a district court could properly exclude evidence that (a) the particular lender to whom the defendant lied did not generally give weight to marital status when deciding whether to lend, or (b) there were prior instances in which that lender did not consider marital status in making loans.

This line between evidence of industry practice and the practice of particular lenders is subtle, but it is in our view the best combined reading of two competing lines of precedent. On the one hand are the cases, already discussed, holding that materiality focuses on the intrinsic nature of the statement, *see, e.g.*, *Peterson*, 538 F.3d at 1072, that negligence is not a defense to fraud, *see, e.g.*, *Colton*, 231 F.3d at 903, and that reliance is not an element of wire fraud, *see, e.g.*, *Neder*, 527 U.S. at 24–25. These cases all counsel toward banning evidence of lender behavior in any form, whether general or particular.

On the other hand is the Supreme Court's recent reasoning in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). *Escobar* involved materiality under the False Claims Act ("FCA").[4] *Id.* at 2001. The plaintiffs there asserted a theory of FCA liability known as "implied false certification." *Id.* at 1995. According to the theory, the defendant was liable under the FCA because, when it submitted its claims for payment to the Government, it did not disclose that it was in violation of material statutory, regulatory, or contractual requirements. *Id.* The

---

[4] The Supreme Court has used cases on materiality in one context as precedent for materiality in another. *See, e.g.*, *Gaudin*, 515 U.S. at 509 (materiality for crime of making false statements) (citing *Kungys*, 485 U.S. at 770 (materiality for revocation of citizenship)).

Court addressed one type of proof admissible to show that one of these allegedly violated requirements was material:

> [P]roof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04. The Supreme Court's language suggests that evidence of the Government's past treatment of a particular requirement is admissible to show that a defendant's violation of that requirement is not material. Translating to the mortgage fraud context, *Escobar* suggests that defendants be allowed to probe lender behavior to some extent. The question is how much.

According to Lindsey, *Escobar* directs that factfinders in a mortgage fraud prosecution be free to consider any evidence of lender behavior, including how an individual lender treats a particular false statement on its loan applications. But this interpretation misses that the Federal

Government in an FCA case is in a far different position than is an individual lender in a mortgage fraud prosecution. A single lender represents only some small part of the market for issuing mortgages. The Federal Government, by contrast, represents the entire market for issuing federal government contracts. The weight the Government gives to a particular statutory, regulatory, or contractual requirement is analogous not to the weight an individual lender gives to a statement on its loan application, but rather the weight the entire mortgage industry gives to that type of statement.

This difference matters because materiality measures natural capacity to influence, not whether the statement actually influenced any decision. *See Peterson*, 538 F.3d at 1072. The way the entire market has historically treated a statement or requirement says a lot about that statement or requirement's natural capacity to influence a decision by market participants. But the way one market participant of many has previously treated a statement says little or nothing about that statement's inherent ability to affect decision making. Add the fact that evidence of individual lender behavior can easily touch on lender negligence, intentional disregard, or lack of reliance—none of which is a defense to mortgage fraud—and a bright-line rule against evidence of individual lender behavior to disprove materiality is both a reasonable and necessary protection and faithful to *Escobar*.

We recognize that an alternative possible rule would be to allow evidence of past behavior by individual lenders, but require a jury instruction that the evidence be considered only for the purpose of evaluating materiality, and not negligence, intentional disregard, or lack of reliance. *See* Fed. R. Evid. 105 ("If the court admits evidence that is admissible against a party or for a purpose – but not against another party or for

another purpose – the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."). We decline to follow this course. As already discussed, the lending standards applied by an individual lender are poor evidence of a false statement's intrinsic ability to affect decision making. There is also a risk that despite a limiting instruction, evidence of prior non-reliance by lenders would still lead factfinders to consider whether the victims themselves relied on the defendant's false statements. A prophylactic rule against all evidence of individual lender behavior best avoids these concerns. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury . . . .").

### III.

Applying our rule here, the district court did not prevent Lindsey from presenting a complete defense. *See United States v. Alvirez*, 831 F.3d 1115, 1125 (9th Cir. 2016). On the one hand, the district court properly excluded evidence of individual lender behavior. When Lindsey's counsel asked a Government witness about specific loans that her employer had approved, the district court sustained the Government's objection. Later, defense counsel asked another Government witness whether a particular loan application was false, and how the witness would have responded to such a false application. The Government objected and the district court again sustained the objection.

On the other hand, the district court properly allowed evidence of the lending standards generally present in the industry. During opening statements, Lindsey's counsel

described 2006 to 2007 as a "wild time" of mortgage lending, and recounted that he had once referred to the period as the "Wild West." He explained that "there were mortgages being offered that had never been offered before and perhaps may never be offered again," and that the mortgages included "stated income" and "no income, no assets" loans. The Government objected, but the district court allowed defense counsel to continue.

The district court later permitted defense counsel to elicit testimony from a Government witness that "stated income" and "no document" loans were common in the market at the time of Lindsey's alleged offenses. It was only when defense counsel began to ask about specific prior bad loans that the district court intervened, sustaining an objection from the Government.

During closing arguments, Lindsey's counsel again hit on the lending standards previously commonplace in the mortgage market. He explained that "[i]n 2006 and 2007 America was on a mortgage loan high." As a result of "[e]asy lending practices" and "100 percent financing of a mortgage on stated income and stated assets," lenders made bad loans to "people [who] bought houses they could not afford." The Government objected to these statements, but the district court overruled the objection. Defense counsel also told the jury that buyers and sellers of real estate were "extremely busy," making money very quickly, and would sometimes make mistakes or "do things on purpose just to close a deal."

After closing arguments, the district court instructed the jury that "[l]oose lending practices do not constitute a defense to wire fraud, but the lending standards applied by the

financial institutions that lent the money in this case are relevant to the question of materiality."  Not only did this instruction allow the jury to consider the evidence of industry lending standards that the district court properly admitted, but it went a step further in Lindsey's favor (contrary to our above holdings) by allowing the jury to consider any evidence of particular lenders' standards that might have squeaked its way into the record.  From opening statement, through the case-in-chief, and on to closing argument and jury instructions, the district court allowed Lindsey to argue and present evidence that his false statements were not material in light of general industry lending standards. Lindsey was not denied his right to present a complete defense. *See Alvirez*, 831 F.3d at 1125.

## IV.

In conclusion, we hold the following: (1) negligence is not a defense to wire fraud, and evidence of lender negligence is not admissible as a defense to mortgage fraud; (2) intentional disregard of relevant information is not a defense to wire fraud, and evidence of intentional disregard by lenders is not admissible as a defense to mortgage fraud; (3) evidence of individual lender behavior is not admissible to disprove materiality, but evidence of general lending standards in the mortgage industry is admissible to disprove materiality; and (4) the district court did not deny Lindsey the opportunity to present a complete defense.  We affirm Lindsey's convictions.

**AFFIRMED.**