**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-2282 |
| *Plaintiff - Appellee*, | D.C. No. 3:20-cr-00228-SI-1 |
| v. | |
| ROBERT J. JESENIK, | OPINION |
| *Defendant - Appellant*. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-2308 D.C. No. 3:20-cr-00228-SI-3 |
| *Plaintiff - Appellee*, | |
| v. | |
| ANDREW N. MACRITCHIE, AKA Andrew MacRitchie, | |
| *Defendant - Appellant*. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 23-2316 D.C. No. 3:20-cr-00228-SI-4 |
| *Plaintiff - Appellee*, | |

v.

BRIAN K. RICE,

    *Defendant - Appellant.*

---

UNITED STATES OF AMERICA,

    *Plaintiff - Appellee*,

  v.

ANDREW N. MACRITCHIE, AKA
Andrew MacRitchie,

    *Defendant - Appellant.*

No. 24-5402
D.C. No.
3:20-cr-00228-SI-3

---

UNITED STATES OF AMERICA,

    *Plaintiff - Appellee*,

  v.

ROBERT J. JESENIK,

    *Defendant - Appellant.*

No. 24-5404
D.C. No.
3:20-cr-00228-SI-1

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted April 2, 2025
San Francisco, California

September 5, 2025

Before: Andrew D. Hurwitz, Lucy H. Koh, and Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Hurwitz

## SUMMARY[*]

### Criminal Law

The panel affirmed three defendants' convictions arising out of the failure of Aequitas Management LLC, an investment management company.

Former Aequitas executives Robert Jesenik, Andrew MacRitchie, and Brian Rice were convicted of wire fraud and conspiracy to commit wire fraud. Jesenik was also convicted of making a false statement on a loan application.

The defendants contended that although they were charged in the operative indictment only with engaging in material misrepresentations and misleading half-truths, they may have been improperly convicted on an omissions theory of fraud without instructions requiring proof of a trusting relationship. Rejecting this contention, the panel wrote

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(1) evidence of what the defendants did not disclose is probative of the materiality of a half-truth or misrepresentation, (2) the government did not argue that omissions alone were sufficient to prove fraud or present that theory to the jury, (3) the government sufficiently tethered non-disclosures to affirmative statements, and (4) the jury instructions fairly stated the law. Whether statements about Aequitas's financial health were misleading half-truths, rather than general claims of financial success or subjective enthusiasm and puffing, was properly a question for the jury.

The panel rejected Rice's challenge to the sufficiency of the evidence to support his conviction.

The panel rejected the defendants' contentions that they were precluded from presenting a complete defense—arguments centered on disclosures in Private Placement Memoranda (PPMs) and audited financial statements. Consistent with other circuits that have addressed the issue, the panel held that contractual disclaimers do not render immaterial other representations in criminal wire fraud prosecutions. For the same reason, the panel rejected the argument that the defendants' representations in sales pitches and marketing materials were immaterial to "accredited" investors. Nor did the district court err in admitting evidence of investors' reliance on those representations.

Finding no abuse of discretion in the district court's denial of a proposed jury instruction on "objective" materiality, the panel held that the instructions given to the jury fairly and adequately covered whether representations in sales pitches and marketing materials were material.

The panel rejected the defendants' claims that the jury was prevented from considering defense theories about

elements other than materiality.  To the extent the defendants challenged the district court's preclusion of evidence about investor negligence or non-reliance, their argument is foreclosed.  The district court's evidentiary rulings did not prevent the defendants from urging legitimate disclosure-based defenses, and the jury instructions adequately covered the defendant's good-faith defense theory.  The panel rejected the defendants' assertion that they were prejudiced by the government's statement in closing that "you can't disclose your way out of fraud."

The panel addressed other issues in a concurrently filed memorandum disposition.

**COUNSEL**

Hannah Horsley (argued) and Ryan W. Bounds, Assistant United States Attorneys; Suzanne Miles, Criminal Appellate Chief; Natalie K. Wight, United States Attorney; Office of the United States Attorney, United States Department of Justice, Portland, Oregon; Christopher Cardani, Assistant United States Attorney, Office of the United States Attorney, United States Department of Justice, Eugene, Oregon; for Plaintiff-Appellee.

Jessica G. Snyder (argued) and Conor Huseby, Assistant Federal Public Defenders; Elizabeth G. Daily, Appellate Chief; Office of the Federal Public Defender, Portland, Oregon; Anna M. Estevao (argued), Claire B. Buck, and Michael Tremonte, Sher Tremonte LLP, New York, New York; Angelo J. Calfo (argued), Angeli & Calfo LLC, Seattle, Washington; Henry C. Phillips, Morgan Lewis & Bockius LLP, Seattle, Washington; Brendan J. Anderson, Morgan Lewis & Bockius LLP, Washington, D.C.; for Defendants-Appellants.

## OPINION

HURWITZ, Circuit Judge:

This case arises out of the failure of an investment management company. After the company was placed in receivership, Robert Jesenik, Andrew MacRitchie, and Brian Rice, former executives of the company, were indicted and eventually convicted of wire fraud and conspiracy to commit wire or mail fraud. Jesenik was also convicted of making a false statement on a loan application.

Each defendant has timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and affirm the convictions for the reasons in this opinion and in a concurrently filed memorandum disposition.

### I.

### Facts and Procedural Background

### A. Facts[1]

Aequitas Management LLC, an investment management company, was founded in the 1990s by Robert Jesenik, its Chief Executive Officer. Andrew MacRitchie, its Chief Compliance Officer, joined the company in 2007, and Brian Rice, an Executive Vice President, joined in 2014.

In the mid-2000s, Aequitas began purchasing discounted receivables from hospitals, later expanding to other businesses, and collected the debt through its affiliates. Sellers of the receivables executed recourse contracts,

---

[1] We recite the facts in the light most favorable to the government, the prevailing party below. *See, e.g.*, *United States v. Halbert*, 640 F.2d 1000, 1008 (9th Cir. 1981) (per curiam).

agreeing to repurchase defaulted debt. Aequitas solicited the funds to purchase receivables through its Private Note Program ("Private Note"), managed by its affiliate Aequitas Commercial Finance ("ACF"), which issued secured subordinated promissory notes to investors. Starting in late 2014, Aequitas also solicited private investments through the Income Opportunity Fund II ("IOF II") and Luxembourg Bond ("Lux Bond").[2] Between June 2014 and February 2016, the period covered by the indictment, Aequitas raised approximately $346 million from private investors, including $167 million through Private Note, $68 million through IOF II, and $15 million through the Lux Bond.

Aequitas's investors were required to be "accredited" under wealth and sophistication standards set by the Securities and Exchange Commission ("SEC") for participation in the Regulation D private securities market. A majority were represented by Registered Investment Advisors ("RIAs"), some of whom also invested their own funds.

Investors were typically solicited through in-person sales pitches by Aequitas executives, sometimes using marketing materials such as a "tear sheet," a one- or two- page summary of the investment, or a longer "pitch deck." Before investors' funds were released to Aequitas, they signed a subscription agreement and acknowledged reading a Private

---

[2] IOF II was a standalone fund, offering senior promissory notes, marketed to Registered Investment Advisors ("RIAs"). The Lux Bond was a debt instrument offered to European investors through a limited partnership in the Cayman Islands.

Placement Memorandum ("PPM"), a lengthy document describing the terms and potential risks of the investment.[3]

By 2014, one of Aequitas's largest receivables assets was student loan debt from Corinthian College. Because of defaults, Aequitas was receiving cash payments of about $4 million per month from Corinthian under a recourse agreement. But Corinthian stopped paying in June 2014 and later filed for bankruptcy.

Aequitas accordingly faced dire short-term cash shortfalls. In response, it offered investors "blue-light specials," promissory notes with short redemption periods and high interest rates. It also persuaded some investors to delay redemptions. These measures, however, provided only short-term relief. The shortfalls were exacerbated by Aequitas's spending on new offices, private jets, and corporate retreats.

The SEC began an investigation into Aequitas in the spring of 2015. In November 2015, Aequitas stopped paying Private Note redemptions, and in January 2016, it defaulted on its obligations to the Private Note investors. The company collapsed in March 2016 and was placed in receivership.

## B. The Indictment

After Aequitas collapsed, Jesenik, MacRitchie, and Rice were indicted on one count of conspiracy to commit mail and wire fraud, 18 U.S.C. § 1349; 28 counts of substantive wire fraud, 18 U.S.C. § 1343; and one count of conspiracy to commit money laundering, 18 U.S.C. § 1956(h). Jesenik

---

[3] Consistent with the trial witnesses and the parties, we refer to subscription agreements, PPMs, and financial statements as "written disclosures" to distinguish them from written marketing materials.

was also charged with one count of making a false statement on a loan application, 18 U.S.C. § 1014. Three other Aequitas executives—Brian Oliver, an Executive Vice President; Olaf Janke, Chief Financial Officer through early 2015; and Scott Gillis, Chief Financial Officer thereafter— entered guilty pleas to various charges. Oliver and Janke testified for the government at the joint trial of Jesenik, MacRitchie, and Rice.

The operative indictment alleged that the three defendants solicited investments through "material misrepresentations and misleading half-truths" about "the uses of investor money, the financial health and strength of Aequitas, Aequitas's investments and investment strategies, and the inherent risks of those investments and investment strategies." In particular, it alleged that the defendants represented to investors that their funds would be used to purchase receivables, but that Aequitas actually "used the majority of new investor money to repay prior investors and to pay operating expenses," because it "was consistently in liquidity and cash-flow crises." It also alleged that Aequitas "concealed [the] material facts" that it had "insufficient collateral to secure the notes it sold to investors," and that the most valuable of its purported assets was an intercompany loan used as an artifice to conceal "accumulating operating losses."

## C. Trial

### 1. The Government's Case

The government's case focused on false or misleading statements to investors in sales pitches, discussions of existing investments, and marketing materials. The government presented evidence that the defendants misled

investors about "how their money was going to be used" and "how secure their investments were."

Investors testified extensively about the importance of marketing materials, especially the tear sheets. One RIA testified that the tear sheet "is pretty much the bible in our industry" to explain investments to clients, and that most of her investors base their investment decisions on the tear sheets, rather than the "fairly generic" PPM. Other RIAs explained that the tear sheets were more valuable than the PPMs for their clients' investment decisions because a "tear sheet is concise and tells you exactly what you need to know about every product you invest in," while the PPM is so "voluminous," "it has things in it that anybody would just not find."[4] Tear sheets, updated quarterly, were also the primary communication from Aequitas to RIAs on "how the funds are doing."

Several investors testified at trial about the importance of verbal communications with Aequitas executives to their investment decisions. One RIA testified that he would "not deal with a company" unless he met with top executives, "the ones who really know what's going on" and provide

---

[4] When asked to explain the relationship between marketing materials and the PPM, Aequitas's general counsel explained:

> The PPM was really a lawyer-driven document that was sort of the CYA to catch all the risk factors and all the things that could go wrong. The marketing materials were very much, "Here is how we are going to invest your money. Here is why investing with us is a good idea and how you'll make money if you trust us to invest your money."

Aequitas's head of marketing explained that the PPM was not a sales tool: "I don't think [the PPM] was even placed in the shared marketing folder."

"the information I need to service my clients." The RIA testified that the "verbal communication that I received from the executives of Aequitas is paramount and far more significant than the PPM." Investors testified that based on their direct communications with the defendants, they decided to invest in Aequitas, recommend Aequitas to clients, and keep their money in Aequitas.

One RIA testified that neither Jesenik, Rice, nor MacRitchie ever talked about the PPM when pitching him, and another testified that none of the defendants stated that their oral statements or the tear sheets should be modified by the PPM. Oliver, Jesenik's former "No. 2" and head of fundraising, stated that he only got the sense a "handful" of times that the disclosures in the PPM changed someone's decision to invest after an in-person meeting.

### a. False Statements
#### i. Uses of Investor Funds

Oliver testified that he and Jesenik pitched investors hundreds of times on "win-win-win-win" investments in healthcare receivables that purportedly offered a built-in safety net, high rates of return, and social benefits to hospitals and patients. Investors found the pitch appealing: one testified that she was interested in healthcare receivables because they were "very secure," "[d]ue to the fact that insurance companies make their payments for the most part, and the majority of individuals are honest people and pay their medical bills."

For blue-light specials, Oliver explained that he and Jesenik developed additional talking points to "combat the potential concerns with investors that the funds are needed to solve a problem/crisis (cash losses, lawsuit, Corinthian, et cetera)." Specially designed marketing materials

highlighted that Aequitas was "seeking short-term liquidity" to pursue "new financing initiatives."

Aequitas investors testified that they relied on representations by each of the defendants that their money would be used to purchase secure receivables. Consistent with those representations, Private Note tear sheets stated throughout the indictment period that investor funds would be used to buy receivables:

> ACF uses proceeds from Private Note primarily to fund or finance the purchase of student loan receivables from educational providers, patient-pay receivables from healthcare providers, other private credit strategy receivables and loan portfolios, or direct collateralized loan and lease obligations, equities, and secured liquidity lines to affiliates for general corporate purposes.

The tear sheet for IOF II stated:

> The Aequitas Income Opportunity Fund II ("IOF II" or the "Fund") follows a value investing approach by acquiring or investing in receivables or loans. IOF II accomplishes this by investing in receivables, loans and leases, often at discounted prices, through Aequitas Capital. Aequitas Capital has established itself within large and inefficient credit markets, such as education, healthcare and private credit, where it provides unique

financing solutions to companies and their consumers.

The Lux Bond marketing materials indicated that investments would be backed by "pools of consumer loan receivables originated through Aequitas Capital's platform," "accessed through structures that provide investors significant credit enhancement."

The reality was far different. Charles Foster, a CPA who performed a forensic accounting of Aequitas during its receivership, testified that he could not identify "meaningful amounts" of private investor funds used to buy receivables during the indictment period.

Aequitas continued to acquire receivables, but largely through bank financing. Because those receivables were collateral for the loans, they did not secure the great bulk of new private investments. Meanwhile, new private investments were overwhelmingly used to pay prior investors and fund operating expenses, because Aequitas's remaining cash-generating investments were not profitable enough to fund its cash needs in the wake of Corinthian's default.

In the fall of 2015, the Private Note tear sheet was revised to state that "ACF uses proceeds from Private Note primarily to repay prior investors." Aequitas investors shown the document at trial testified they would never have invested had they known this. As one RIA put it, he would not have invested "a penny" of his clients' money "[b]ecause that's the definition of a Ponzi scheme."

### ii. Security of Investments and Aequitas's Financial Health

Oliver testified that a "strong selling point" was that clients' investments were secure because, in addition to the "recourse element," they were backed by Aequitas's other assets. One RIA described Jesenik and Oliver "[t]elling me about their Private Notes; how successful they have been over the years; the fact that in 2008 during the credit crisis their company did not miss any payments to any of their investors and how prudent they were with the investments that they made over the years and how they grew their company over the years."

Aequitas executives also stressed the company's assets, growth, and financial health to reassure concerned investors. One investor testified that he was convinced Corinthian's collapse would have no impact on his investments based on a letter from Jesenik, MacRitchie, and Janke assuring investors that their investment was "strongly protected" by the collateral and cash flow of ACF and its growing portfolio of investments.

Marketing materials were consistent with these representations. For example, Private Note tear sheets indicated that promissory notes were supported by a lien on all assets of ACF and included a "collateral summary" showing the total value of ACF's assets compared to the Private Note debt. Until revised in the fall of 2015, the summary indicated that ACF had twice as much collateral as was owed to them as a group, which was, as one investor

testified, "a very good profile," and that approximately one-third of this collateral was receivables.[5]

In fact, only about half the total claimed value of assets—and only a fraction of ACF's claimed receivables—was available as collateral for Private Note holders after deducting the senior interests of others, such as banks. Moreover, one of ACF's largest purported assets, categorized on tear sheets as "corporate debt," was a loan to its parent company, Aequitas Holdings (the "Holdings Note"), which used the money to pay operating expenses of other Aequitas affiliates. This loan, which grew dramatically during the indictment period, was severely undercollateralized. According to Foster, by the end of the indictment period, the debt on the Holdings Note was $180 million, but at least $110 million, and perhaps as much as $170 million, could not be repaid in the event of liquidation. On top of this, the value of Aequitas's third major asset category—equity investments—was based largely on unrealized gains in the estimated value of a company that serviced healthcare receivables.[6] Investors testified that they would not have invested had they known the true nature of "corporate debt" or the actual amount of available collateral.

---

[5] For example, the Q1 2015 tear sheet stated that ACF had assets with a "collateral value" of $772,259,000 to support $364,822,000 of "subordinated debt" and $136,721,000 of "senior debt and credit facilities." The asset allocation chart listed $113,595,000 in education credit, $41,832,000 in healthcare credit, $26,505,000 in transportation credit, and $28,816,000 in consumer and small business credit.

[6] The revised Q3 2015 tear sheet removed the "corporate debt" category, replacing it with "loans to affiliates." Taken together, equity investments and loans to affiliates comprised 84% of the assets purportedly backing Private Note investments.

### b. The Defendants' Roles in the Conspiracy

Jesenik directed solicitation of new investments, efforts to persuade existing investors to delay redemptions, and use of new investor funds to manage ongoing cash shortfalls. Janke testified that "nothing" about Aequitas's financial situation "went without his approval." Jesenik also solicited investments directly.

MacRitchie oversaw and approved Aequitas's marketing materials. He also directly solicited investments, especially in the Lux Bond, which he established.

Rice managed Aequitas's sales to RIAs, for whom he became the primary contact in 2015, and personally solicited RIA investments in IOF II and Private Note. Rice also coordinated efforts to fundraise and delay redemptions.

Oliver and Janke testified that the defendants knew they were misleading investors about the uses of their funds and security of their investments. Top Aequitas executives, including the three defendants, were regularly apprised at executive committee meetings of the company's financial situation, including its increasing operating losses and the value of the Holdings Note. Jesenik and Rice also received frequent "cash dash" emails, which documented Aequitas's urgent cash shortfalls needed to repay prior investors and fund operating expenses. Emails documented the defendants' coordination of fundraising efforts and allocation of new investor money to meet these shortfalls.

Two former Aequitas employees, Vanessa Dehaan and Jessica Cataudella, testified that during compliance testing in the spring of 2015, they became concerned that Aequitas was engaging in a Ponzi scheme. They raised their concerns to MacRitchie, who rebuffed them.

Dehaan and Cataudella then shared their concerns with Robert Holmen, who became general counsel in June 2015, shortly after the SEC investigation began. Over the summer and fall of 2015, Cataudella and Holmen sought to revise marketing materials and PPMs to accurately reflect Aequitas's uses of investor funds and the value of its assets. In describing those efforts, Cataudella explained that:

> So it all has to connect. It all has to match. One cannot be saying one thing and then another document say, "Well, we are really not doing that," right. So, for instance, if you're soliciting investor assets, and you know that those assets may not be used for its intended purposes, you can't have a backstop, in my view, of a PPM.
> . . . .
> It means you can't say to someone, "Well, we are not going to use your money for what we say we are going to use" and have that be okay; have no repercussions made.

In this testimony, Cataudella used a "tongue-in-cheek" phrase that she said was common in the compliance industry: "you can't disclose away fraud." Investors did not receive the revised materials until late 2015 and early 2016.

At a meeting attended by MacRitchie and Rice on September 1, 2015, Holmen raised concerns that Aequitas was at risk of being unable to pay its investors because ACF had net negative revenue and net negative equity, and over $90 million of the then-$150 million Holdings Note was unsupported by collateral. Holmen also observed that during July and August, several million dollars raised from IOF II

investors had been transferred to ACF to pay Private Note investors and operating expenses, and "point[ed] out that using one set of investors' money to redeem investors at 100% out of a different fund that is in the red may be deemed a Ponzi scheme." Holmen had raised his concerns with Jesenik the week before.

On September 1, Oliver sent Rice an email expressing concern that despite Holmen's warnings of "compliance and disclosure risks around ACF being viewed as insolvent and having insufficient asset/collateral value to support the Private Note holders," Aequitas would "fall into a false sense of security that we are in some accounting manner 'making money' when we are in fact burning it at an alarming pace." Oliver sent a similar email to MacRitchie, who replied:

> To be honest, though, we have been heading towards this point for a couple of years - spending money we don't have, addicted to the Private Note investments. . . . We are heading for a big train wreck, and I don't know how we avoid it.

Nonetheless, the defendants continued to solicit investments through Private Note, IOF II, and the Lux Bond to meet ongoing shortfalls without disclosing the facts underlying Holmen's concerns.

On September 23, 2015, Oliver sent Rice an email about pitching RIAs on a "short term . . . bridge financing opportunity" to help Aequitas raise $7-10 million to buy healthcare receivables, "[s]o we are singing from the same song sheet." The "song sheet" email followed an internal email in which Oliver indicated that because of upcoming redemptions due to investors, Aequitas would have a $6.5

million shortfall by the end of the month—assuming it could use $6.4 million of new Lux Bond funds. Chris Bean, an RIA, testified that Rice told him on September 24 that Aequitas was "urgently looking for cash" to capitalize on a "time-sensitive investment opportunity" to "exercise options on two businesses that were performing well," and would offer up to $10 million in Private Note with a 90-day redemption period and a high interest rate. Based on Rice's representations, Bean's clients committed $4 million during the following week.

In multiple conversations with Bean during the fall of 2015, Rice did not disclose Aequitas's liquidity crisis, difficulty meeting payroll and late redemptions, the SEC investigation, or Holmen's concerns. Bean testified that he would not have invested his clients' money had he known these facts or that their money would not be used for a time-sensitive receivables investment opportunity.

On September 30, 2015, a European company invested $5 million in the Lux Bond. MacRitchie then told Gillis that he "could loan up to $3 M[illion] [to ACF] short term." Although Holmen advised that the loan was risky, MacRitchie authorized it. Nicholas Mavroleon, who helped solicit Lux Bond investments and witnessed MacRitchie pitch the Lux Bond to European investors several times, testified that he had never heard MacRitchie mention the use of investments for affiliate loans. Mavroleon also testified that MacRitchie presented the Lux Bond as a "bankruptcy remote vehicle," as did the pitch deck. In February 2016, Aequitas informed the European company it could not repay the loan.

By early November 2015, Aequitas had stopped paying Private Note redemptions, and on December 1, Oliver

internally circulated a draft letter explaining this to investors. Although Holmen had recommended ending Private Note fundraising on October 30, it continued thereafter, as the defendants attempted to reassure increasingly concerned investors. Brett Trowbridge, an investor who was told that his money would be used to buy receivables, signed a subscription agreement in November 2015, but delayed wiring investment funds to Aequitas because he was concerned about the SEC investigation. Contrary to Holmen's advice, Trowbridge was not sent an updated tear sheet.

Trowbridge met with Oliver and Jesenik in December to discuss whether the company was healthy and his $1.5 million investment was safe. At the meeting, Jesenik "talked about the big picture of the business; how well it was going"; about the company's expansion to New York and Europe; and said that the receivables business was "healthy and good." Jesenik assured Trowbridge that the SEC investigation would be resolved soon, and Oliver said the company's cash flow was positive. Neither mentioned liquidity problems or that Aequitas had stopped paying redemptions. Trowbridge testified that he would not have invested had he received the updated tear sheet or Oliver's draft letter, and that he felt Jesenik lied to him.

## 2. The Defense

Jesenik and MacRitchie focused heavily on the PPMs and other written disclosures, particularly ACF's audited financial statements. Jesenik's counsel argued that:

> [I]nformation conveyed to investors by Bob Jesenik was not a misleading half-truth. . . . The government wants to make this about

oral pitches and marketing materials, and it is about that. . . It is about everything investors were told.    Simply put: If there is full disclosure, there is no fraud, right.  There is no intent to deceive or cheat.

MacRitchie's counsel similarly argued:

There is no half-truth when the whole truth was provided.  And there is no requirement that every piece of information be provided on a one-page marketing piece obviously.

These defendants stressed that documents other than the tear sheets disclosed critical facts about the use of investor funds and Aequitas's finances that were allegedly left out of verbal discussions and marketing materials.  For example, the Private Note PPM's "Uses of Proceeds" section disclosed that some investor funds might be used to pay prior investors:

The Company generally pays the principal and interest of Secured Notes from the proceeds from repayments of loans, leases, subordinated debt investments and similar assets of the Company and sales of Company assets.  From time to time, the Company may use proceeds of the sale of Secured Notes to repay the principal and interest of previously issued Secured Notes due principally to the illiquid nature of many of the Company's investments and to the Company's ongoing efforts to reduce its weighted average cost of capital by, in part, replacing Secured Notes

bearing higher interest rates with Secured Notes bearing lower interest rates.

It also disclosed that "[t]he Company uses proceeds to provide lines of credit for the benefit of its affiliates," including to "[p]rovide working capital and operating liquidity." A lengthy appendix of risk factors discussing the security of investments elaborated that: "from time to time a significant portion of the collateral securing the Secured Notes may be in the form of loans or other obligations owed to the Company by its affiliates." An October 2014 supplement disclosed Corinthian's default and the resulting possibility of a "material adverse effect" on Aequitas's "operations and financial performance and its ability to repay the Secured Notes."

Both tear sheets and PPMs directed potential investors to ACF's financial statements. Serena Morones, a defense forensic accounting expert, testified that ACF's audited financial statements disclosed Aequitas's loans to affiliates, including the Holdings Note, and their growth over time. Morones also testified that the financial statements made plain that Aequitas had "very negative cash flow," that most of its income was from unrealized, non-cash gains, and that the company depended on borrowing from banks and private investors to finance its operating losses. She further testified that, based on other information in the statements, a reader could "connect the dots" that investor funds were being used for operating expenses and redemptions.

Jesenik and MacRitchie argued that their written disclosures showed a lack of intent to defraud. They believed their investors read the PPMs, "the main document for explaining how the investment works," and asserted that

they relied on lawyers and accountants who reviewed the PPMs and financial statements.

Jesenik and MacRitchie also attacked the credibility of investors who testified to basing investment decisions on verbal communications and marketing materials, emphasizing that RIAs in particular had due diligence obligations to their clients to read the PPMs and financial statements.  Using the PPMs and financial statements extensively at trial, defense counsel cross-examined investors and RIAs, some of whom admitted that these documents conveyed information allegedly not disclosed by the defendants or in marketing materials.

For example, Bean, an RIA who invested in September 2015, acknowledged that the Private Note PPM disclosed that some funds could be used for operating expenses, and accurately disclosed risks related to cash-flow issues and insufficient or unavailable collateral, although he considered these to be worst-case, hypothetical scenarios rather than "a forecast or an expectation."  Bean also conceded that the PPM disclosed ACF's loans to affiliates and that the audited financial statements disclosed that one of these loans was the then-$120 million Holdings Note.  And he further agreed that he told his clients that Aequitas's "balance sheet and audit report looks great," even though the financial statements showed a net income loss of $15 million in 2014; operating losses; and that a significant amount of ACF's income was from unrealized gains in equity investments. Defense counsel also elicited testimony that Bean and another RIA had been sued by their clients for due diligence failures.

Addressing the latter end of the indictment period, Jesenik argued that he was an honest businessman who

believed in the company and kept fundraising so Aequitas could survive the "bank run" brought on by the SEC investigation and exacerbated by the illiquid nature of its collateral. MacRitchie argued that he was outside the inner circle and only became aware of Aequitas's financial problems in the summer of 2015. Both emphasized that they supported changes to marketing materials once professionals told them they were needed.

Rice's defense was different. He was not alleged to have become a co-conspirator until February 2015, when he began receiving "cash dash" emails. Rice argued that any misrepresentations he made to investors were the result of misrepresentations the other defendants made to him.

Rice conceded that he was aware of the cash shortfalls and, later, the Ponzi scheme concern, but thought these were short-term accounting issues that could be fixed. He argued that the PPMs and tear sheets existed before he arrived, and, like his co-defendants, that he supported updating PPMs and marketing materials in late 2015. Rice also argued that he did not mislead the RIAs into investing in receivables, because they had all already been pitched by Jesenik and Oliver and had done their own due diligence.

## D. Verdicts and Sentences

After a six-week trial, a jury returned verdicts finding all defendants guilty of one count of conspiracy to commit mail and wire fraud and 28 counts of wire fraud. Jesenik was also found guilty of making a false statement on a loan application.[7] Jesenik was sentenced to 168 months of

---

[7] All defendants were acquitted of conspiracy to commit money laundering.

imprisonment; MacRitchie to 70 months; and Rice to 37 months.  All timely appealed.

## II.

We first address all defendants' contention that they may have been convicted on an invalid legal theory of fraud and Rice's challenge to the sufficiency of evidence.

## A.

The elements of wire fraud in violation of 18 U.S.C. § 1343 are "(1) the existence of a scheme to defraud; (2) the use of wire, radio, or television to further the scheme; and (3) a specific intent to defraud." *United States v. Lindsey*, 850 F.3d 1009, 1013 (9th Cir. 2017) (quoting *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013)).[8]  A "scheme to defraud" requires the use of "*material* falsehoods." *Id*. (quoting *Neder v. United States*, 527 U.S. 1, 20 (1999).  "[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decisionmaker to whom the statement was addressed." *United States v. Galecki*, 89 F.4th 713, 737 (9th Cir. 2023) (cleaned up).

False statements can include "misleading half-truths," *see, e.g.*, *United States v. Lloyd*, 807 F.3d 1128, 1153 (9th

---

[8] The statute provides that a person commits wire fraud if:

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, [he] transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [. . .].

18 U.S.C. § 1343.

Cir. 2015); *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967), representations that are partly true but misleading "because of [the defendant's] failure to state additional or qualifying matter," *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188 (2016) (cleaned up). Even in the absence of a false statement, a conviction can be based on a failure to disclose material facts. *See United States v. Shields*, 844 F.3d 819, 822 (9th Cir. 2016). But wire fraud can be premised on such an omissions theory only if the defendant had a special "trusting relationship" with the victim. *Id.* at 823. That relationship is not required in fraud cases premised on misrepresentations, including half-truths. *See Lloyd*, 807 F.3d at 1153; *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986).

The defendants contend that although they were charged in the operative indictment only with engaging in "material misrepresentations and misleading half-truths," the government really presented an omissions theory at trial.**[9]** They argue that the district court therefore erred in denying proposed instructions requiring proof of a trusting relationship.

"We review de novo whether the Government's theory of fraud at trial was legally valid." *United States v. Milheiser*, 98 F.4th 935, 941 (9th Cir. 2024). "[A] general verdict that may rest on a legally invalid theory" cannot stand unless we are convinced beyond a reasonable doubt that presentation of the invalid theory "did not contribute to the jury's verdict." *United States v. Yates*, 16 F.4th 256, 269–70 (9th Cir. 2021) (cleaned up). Such an error is not

---

[9] The original indictment also alleged the defendants engaged in "omissions of material facts." This allegation was dropped in a superseding indictment.

harmless even "where the verdict is supportable on [another] ground." *Yates v. United States*, 354 U.S. 298, 312 (1957).

**B.**

The defendants assert that the government improperly "focused [its case] on non-disclosure alone, rather than whether omitted information made any affirmative statement materially misleading." They cite the government's questioning of investors about whether they would have invested had they known certain undisclosed facts and the government's discussion of that testimony in closing argument.

They object particularly to the government's statement in closing argument that an RIA was "defrauded" because:

> Brian Rice failed to disclose liquidity problems at Aequitas. He failed to disclose the SEC investigation, the payroll funding, or that the general counsel of Aequitas had raised concerns in early September that the firm was running a Ponzi scheme.

To the extent the defendants argue that it was error for the district court to allow the government to ask investors "would you have invested had you known" questions, or to discuss what the defendants did not disclose, we disagree. It is well-established that such evidence is probative of the materiality of a half-truth or misrepresentation. *See United States v. Laurienti*, 611 F.3d 530, 549 (9th Cir. 2010) (approving "[i]f you had known" questions).

And the government did not argue that omissions alone were sufficient to prove fraud or present that theory to the jury. Rather, the government elicited extensive testimony

about the relevant affirmative statements when questioning witnesses about non-disclosures, and stressed these affirmative statements in closing argument. For example, RIA Jeff Sica, whose 70 clients had invested a total of $32 million in Private Note, testified that he became concerned about the security of those investments after Aequitas refused to redeem a client's $10 million note when it was due in April 2015, and only did so two months later.

Sica had previously been assured by Rice that Aequitas "was very secure; that they had plenty of assets; that business was great." Later, when Sica asked why the redemption was late, Rice told him: "Well, we don't do a good job managing our liquidity. So it is not a matter that there are not assets; it's [that] the leadership needs to change." Around the time of a due diligence visit in October 2015, after Sica had requested redemption of all his clients' notes, he told Rice he suspected Aequitas was a Ponzi scheme, and Rice denied it. He also testified that Rice continued to pitch him on Aequitas products and tried to persuade him to delay redemptions into November 2015. At trial, the government asked Sica about the facts Rice failed to disclose in the context of this testimony, and in closing argument, the government's comments about what Rice "failed to disclose" followed discussion of Sica's interactions with Rice in the fall of 2015. Thus, the government sufficiently tethered Rice's non-disclosures to his affirmative statements.

## C.

The defendants also claim that the district court erred in denying three proposed instructions: (1) "[a] nondisclosure [ ] can support a [wire] fraud charge *only* when there exists an independent duty that has been breached by the person so

charged"; (2) "omissions alone are not sufficient to support a charge of mail or wire fraud"; and (3) "[a]n omission alone – absent a connection to a half-truth – does not constitute a misrepresentation."

"In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *Lloyd*, 807 F.3d at 1164 (quoting *United States v. Dixon*, 201 F.3d 1223, 1230 (9th Cir. 2000)). We determine whether an instruction misstates the law de novo but review its "language and formulation" for abuse of discretion. *United States v. Rodriguez*, 971 F.3d 1005, 1012 (9th Cir. 2020). Instructions are evaluated "as a whole, and in context," *id.*, and we afford the trial judge "substantial latitude so long as the instructions fairly and adequately covered the issues presented," *United States v. Moe*, 781 F.3d 1120, 1127 (9th Cir. 2015) (quoting *United States v. Bauer*, 84 F.3d 1549, 1560 (9th Cir. 1996)).

At the defendants' request, the district court defined "half-truth" in an instruction drawn directly from *Universal Health Servs., Inc.*, 579 U.S. at 188, and Ninth Circuit Model Criminal Jury Instruction 15.35. The instruction required the government to prove that a defendant "knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money by means of a false or fraudulent representations," and then stated:

> Deceitful statements of half-truths may constitute false or fraudulent representations. A half-truth is a representation that states the

truth only so far as it goes, while omitting
critical qualifying information.

This instruction fairly stated the law.  Had the defendants
been charged under an omissions theory, the government
would have been required to show a relationship giving rise
to a duty to disclose.  *See Shields*, 844 F.3d at 822–23;
*United States v. Spanier*, 744 Fed. App'x 351, 353–54 (9th
Cir. 2018).  But these defendants were not so charged, and
the district court therefore did not err in denying the
defendants' proposed "independent duty" instruction.  *See
United States v. Farrace*, 805 Fed. App'x 470, 473 (9th Cir.
2020).  For the same reason, the district court did not abuse
its discretion in denying the proposed instruction that
"omissions alone are not sufficient to support a charge of
mail or wire fraud" and that "[a]n omission alone – absent a
connection to a half-truth – does not constitute a
misrepresentation."

Moreover, the district court instructed the jury shortly
after the relevant portion of the government's closing
argument that because the indictment only alleged
misrepresentations and half-truths, the argument about what
the defendants failed to disclose was only relevant to
whether the defendants made any "deceitful half-truths."
Using language nearly identical to the defendants' proposed
instruction, the court then told the jury that "[i]f all we have
is an omission or a failure to disclose, that's not actionable
here."  That instruction fairly covered the substance of the
defendants' proposed instruction.

## D.

"Puffing concerns expressions of opinion, as opposed to
the knowingly false statements of fact which the law

proscribes."  *United States v. Tarallo*, 380 F.3d 1174, 1191
(9th Cir. 2004), *amended*, 413 F.3d 928 (9th Cir. 2005)
(cleaned up).  The defendants contend that their statements
about Aequitas's financial health were merely "generic
claims of financial success" or "subjective enthusiasm and
puffing."  We are not persuaded.

The defendants highlight the government's emphasis in
closing argument on investors' testimony that they were
misled by the defendants' statements that Aequitas was "just
doing outstanding" and "growing very rapidly," focusing on
a portion of the argument that followed the court's
supplemental instructions about half-truths and omissions:

> All of those things that they were
> complaining about in that testimony that I
> summarized for you, those were omissions in
> service of the half-truths that, "Hey,
> everything at Aequitas is going great."

But given the severe financial straits that Aequitas was in
when these statements were made and the defendants'
knowledge of the company's finances, a jury could well find
them to be "knowingly false statements of fact."  *Tarallo*,
380 F.3d at 1191; *see United States v. Autuori*, 212 F.3d 105,
118–19 (2d Cir. 2000) (finding that a jury could infer that
the defendant's representations that PPM forecasts were
"good" and "credible"; that a partnership project was "safe";
and that his prestigious accounting firm "stood behind the
numbers" were not puffing, but rather "representations that
contradicted his honest view").

The defendants also claim that non-disclosures about
liquidity problems, difficulty paying operating expenses,
and an SEC investigation did not render general statements

about Aequitas's financial health "half-truths" because they were insufficiently "tethered" to those claims or did not "pertain[] to the same topic."  They cite the Supreme Court's "classic example of an actionable half-truth": "the seller who reveals that there may be two new roads near a property he is selling, but fails to disclose that a third potential road might bisect the property."  *Universal Health Servs.*, 579 U.S. at 188–89.  In the context of this case, however, the defendants' affirmative representations that Aequitas was in good financial health, made while soliciting purportedly secure investments in income-generating assets, have a plain nexus to non-disclosures about liquidity problems, difficulty paying operating expenses, and an SEC investigation concerning potential misuse of investor funds.  Whether those representations were misleading half-truths was therefore properly a question for the jury.

### E.

Rice challenges the sufficiency of evidence supporting his conviction.  We must decide whether the evidence, viewed in the light most favorable to the government, is sufficient for a "rational trier of fact" to have "found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  The evidence in this case satisfies that forgiving standard.

For example, four RIAs testified that Rice personally solicited them to invest in receivables during 2015 through IOF II and Private Note.  Starting in February 2015, however, Rice had received "cash dash" emails indicating unequivocally that these funds would in fact be used for payroll and to repay prior investors.  And, although Aequitas's general counsel told Rice in September 2015 that Aequitas could be engaging in a Ponzi scheme, Rice

continued to facilitate investor due diligence visits and
solicit investments to meet ongoing urgent cash shortfalls
without disclosing the actual uses of investors' funds, the
SEC investigation, or that the investments were not secure.

### III.

We next address the defendants' contentions that they
were precluded from presenting a complete defense. These
arguments again center on disclosures in the PPMs and
audited financial statements.

### A.

### 1.

The defendants first assert that the district court erred in
admitting any evidence of representations in sales pitches
and marketing materials, and evidence that investors relied
on these representations. They argue that disclaimers of
reliance in the subscription agreements and PPMs rendered
any representations outside those documents immaterial.[10]
They also argue that verbal representations and marketing
materials could not be "objectively" material to Aequitas's
"accredited" investors given the written disclosures,
especially to RIAs with fiduciary duties to their clients.

We disagree. "[T]he focus of the mail fraud statute, like
any criminal statute, is on the violator." *United States v.*

---

[10] The Private Note and IOF II PPMs both stated:

> No person has been authorized in connection with this
> Offering to give any information or make any
> representations other than those contained in this
> Memorandum or the Transaction documents and, if
> given or made, such information or representations
> must not be relied upon as having been authorized by
> the Company.

*Weaver*, 860 F.3d 90, 95 (2d Cir. 2017) (per curiam) (cleaned up). Proof of a scheme to defraud does not require showing that a victim relied on the defendant's falsehoods; it is sufficient that falsehoods were material. *Lindsey*, 850 F.3d at 1014. Materiality, as opposed to reliance, is an objective measure of a representation's "tendency to influence" "the decisionmaker to whom [it] was addressed." *Galecki*, 89 F.4th at 737 (cleaned up); *see also Lindsey*, 850 F.3d at 1013–14.

Whether a representation has a *tendency* to influence a decisionmaker is not the same question as whether the decisionmaker would be justified in relying on it. Justifiable reliance is relevant to civil liability for fraud, but not to criminal liability. *See Neder*, 527 U.S. at 24–25; *see also Weaver*, 860 F.3d at 95. Thus, consistent with other circuits that have addressed the issue, *see, e.g.*, *Weaver*, 860 F.3d at 95–96; *United States v. Lucas*, 516 F.3d 316, 339–40 (5th Cir. 2008); *United States v. Ghilarducci*, 480 F.3d 542, 547 (7th Cir. 2007), we hold that contractual disclaimers do not render immaterial other representations in criminal wire fraud prosecutions.

For the same reason, we reject the argument that the defendants' representations in sales pitches and marketing materials were immaterial to "accredited" investors. To be sure, "materiality is judged in relation to the persons to whom the statement is addressed." *Galecki*, 89 F.4th at 737 (cleaned up). But "the wire fraud statute protects the naive as well as the worldly-wise." *United States v. Ciccone*, 219 F.3d 1078, 1083 (9th Cir. 2000) (cleaned up). Materiality is a question of fact for the jury, *see United States v. Gaudin*, 28 F.3d 943, 944 (9th Cir. 1994) (en banc), *aff'd*, 515 U.S. 506 (1995), and the district court properly left the materiality issue to the jury.

Nor did the district court err in admitting evidence of investors' reliance on these representations.  Although not dispositive, a victim's reliance on the defendant's falsehoods is probative of materiality.  *See Phillips v. United States*, 356 F.2d 297, 308 (9th Cir. 1965) ("Evidence that appellants' sales materials did in fact deceive persons to whom it was directed, causing them to rely upon it, tends to show that such materials were of the nature charged.").

**2.**

The defendants also argue that they were entitled to this proposed jury instruction on "objective" materiality:

> Whether or not a statement is capable of influencing the decision-making body to which it was addressed is evaluated objectively.  In considering whether a statement is material, you should consider the context in which the communications occurred, including any evidence about industry practice, agreements between the parties, the parties' professional status or accreditations, and other information known to the parties at the time the allegedly false statements were made.  The government does not need to prove that the statement actually influenced any decisionmaker.

We find no abuse of discretion in the district court's denial of this instruction.  The court accurately instructed the jury that:

> An oral or written statement is material if it has a natural tendency to influence, or was

> capable of influencing, a person to part with money.  Neither proof of reliance on a false statement nor actual harm is needed to show materiality.

The jury was also instructed that "[i]n determining whether a scheme to defraud exists, you may consider not only a defendant's words and statements, but also the circumstances in which those words and statements are used, considered as a whole."  *See* Ninth Circuit Model Criminal Jury Instruction 15.35.  These instructions fairly and adequately covered whether representations in sales pitches and marketing materials were material.

### B.

The defendants next assert that the jury was prevented from considering defense theories about elements other than materiality.  We reject those claims.

### 1.

The district court granted a government pretrial motion to preclude evidence or argument that investors should have "exercised more due diligence or skepticism in their dealings with Aequitas" and that investors did not actually rely on the co-conspirators' allegedly false statements.  The defendants argue that the court then improperly limited their cross-examination of investors about the contents of the relevant disclosures and their "failure to read, understand, or appreciate" them.

To the extent that the defendants challenge the district court's preclusion of evidence about investor negligence or non-reliance, their argument is foreclosed by *Lindsey*, a case involving mortgage fraud.  We held there that "a bright-line

rule against evidence of individual lender behavior to disprove materiality is both a reasonable and necessary protection" because "evidence of individual lender behavior can easily touch on lender negligence, intentional disregard, or lack of reliance—none of which is a defense to mortgage fraud."  850 F.3d at 1017.[11]  We find no reason to adopt a different rule in this case, simply because the loans gave rise to promissory notes instead of mortgages.

The defendants also argue that evidence of investor negligence or non-reliance is admissible to impeach the investor "by confronting the investor with contradictory information provided to him by the defendants in the PPM," and to show whether the defendants had an intent to defraud. The defendants cite the cross-examination of Bob Zamarripa, who invested $12 million with Aequitas. Zamarripa testified that he was misled by Jesenik's assurances that "a hundred percent" of his money would go to secure health care receivables and not to pay other investors.  During cross-examination, Zamarripa testified that he had not read the subscription agreements and PPMs. The court admitted these documents, and allowed defense counsel to show Zamarripa one of the subscription agreements and ask whether it instructed him to read the PPM.  However, the court sustained a series of relevancy objections when defense counsel attempted to ask more questions about the contents of the documents, given Zamarripa's admission that he had not read them.

---

[11] Instead, defendants may seek to disprove materiality through generally accepted standards, *id.* at 1016, because "[t]he way the entire market has historically treated a statement or requirement says a lot about that statement or requirement's natural capacity to influence a decision by market participants," *id*. at 1017.

These evidentiary rulings did not prevent the defendants from urging legitimate disclosure-based defense theories. The court admitted PPMs, subscription agreements, and audited financials, and several investors admitted that those documents were material to their decisions. The court also admitted defense expert testimony about these documents, and allowed extensive questioning of investors who had read them about their contents.

Evidence of Aequitas investors' lengthy experience in the financial industry—and RIAs' due diligence obligations—was also admitted, as was testimony that some RIAs' former clients blamed them for their financial losses, and that two had been sued for negligence. The defendants were allowed to cross-examine investors about their claims that they had not read the PPMs and that they were unaware of Aequitas's financial difficulties. Over government objections, the district court allowed defense counsel to ask investors questions relevant to credibility "even if it may have the secondary effect of implying that there was inadequate due diligence." The court also admitted testimony about the defendants' reliance on lawyers, accountants, and compliance professionals, and their support for revisions to the PPMs and tear sheets in response to those professionals' concerns.

## 2.

The district court's materiality instruction stated, in relevant part:

> It is not a defense to a charge of mail or wire fraud or a charge of conspiracy to commit mail or wire fraud that an investor or registered investment advisor may have been

gullible, careless, naive, or negligent or even
that an investor or registered investment
advisor intentionally disregarded
information.

The defendants argue that the instruction "suggested that
disclosures could not be considered as to any issue" and that
in the absence of "an accompanying admonition that truthful
disclosures could be considered in connection with good
faith or lack of a scheme to defraud, the instruction
fundamentally misled the jury."

We disagree. The instruction is drawn from *Lindsey*, in
which we held that "negligence is not a defense to wire
fraud" and "intentional disregard of relevant information is
not a defense to wire fraud." 850 F.3d at 1019. The
defendants attempt to distinguish *Lindsey* because it focused
on whether lenders' disregard of relevant information was
admissible to disprove the materiality of the defendant's
false statements, *see id.* at 1015–16, while they wished to use
such evidence to argue other defenses.

To the extent the defendants argue that "if an investor
felt misled, it was because the investor . . . chose to disregard
part of the complete representation," they effectively seek to
urge that Aequitas's investors were negligent. As *Lindsey*
emphasizes, "negligence is not a defense to wire fraud." *Id.*
at 1015, 1019.

More importantly, the challenged instruction did not
indicate that the written disclosures were irrelevant. Indeed,
the defendants were permitted to argue that the written
disclosures were accurate, material to investors, and
indicative of the defendants' good faith. In closing, Jesenik
and MacRitchie both argued extensively that any alleged

misrepresentations did not qualify as half-truths in light of the disclosures. All defendants robustly argued that their provision of written disclosures to investors was evidence of good faith. And the defendants were allowed to attack the investors' credibility.

The jury was instructed that "[i]n determining whether a scheme to defraud exists, you may consider not only a defendant's words and statements, but also the circumstances in which those words and statements are used, considered as a whole." *See* Ninth Circuit Model Criminal Jury Instruction 15.35. Taken together with the court's instructions on half-truths, materiality, good faith, fraudulent intent, and witness credibility, the "instructions, in their entirety, adequately cover[ed] th[e] defense theory." *Moe*, 781 F.3d at 1127 (cleaned up).

### 3.

In its rebuttal, the government stated:

> A few things about the jury instructions. You see here "negligence by the investors and the RIAs is not a defense to fraud." So allegations that they should have done this and that they should have done that are not allegations [sic] to fraud if you find that the defendants acted with the intent to defraud.
>
> You have other jury instructions. But the oral statements—in considering what evidence has been promoting the fraud, the oral statements by Mr. Jesenik, by Mr. Oliver, by Mr. Rice. The investor/RIA testimony about the tear sheets, the pitch decks that contain

false information.  The cooperator testimony we provided and the written documentation.

The PPM—a lot of evidence about the PPM and whether they are in support of a reliance defense or good faith on the part of the defendants.  Members of the jury, I suggest that's not a proper defense.  If you find that these defendants—who individually have to be assessed—but if you find that they approached or promoted—in approaching investors to give them money under false pretenses, "We are doing great; your money is going for receivables," knowing that it is not, that's fraud.  The crime has been completed.  And as Jessica Cataudella said, "You can't disclose your way out of fraud," meaning you can't use the PPM, which has 50 pages of legalese, footnotes, warnings, buzzers, and bells that lawyers write and the SEC monitors, it's important, no doubt, but it's not important to this fraud because—

After MacRitchie's counsel objected that the prosecutor misstated the burden of proof, the court instructed the jury that intent to defraud and good faith were defined in the jury instructions.

The defendants assert that they were prejudiced by the government's statement in closing that "you can't disclose your way out of fraud."  They claim that, like the court's materiality instruction, this argument improperly indicated that jurors could not consider whether their purportedly truthful written disclosures cured other alleged misrepresentations or demonstrated good faith.  Relatedly,

the defendants also contend that the district court erred in denying a proposed addition to the court's instruction on the definition of a half-truth: "If the speaker does provide that critical qualifying information, the duty to speak is satisfied and the statement does not amount to a misrepresentation." We reject the argument.

The government's argument accurately recounted the testimony of Cataudella, the former Aequitas compliance officer, in which she said that "you can't disclose away fraud" was a common phrase in the compliance industry.[12] In context, the argument was not improper, because whether the defendants' written disclosures sufficed to make alleged misrepresentations not misleading was a question for the jury, and the jury was properly instructed on how to consider evidence of those disclosures. Moreover, the court gave a prompt curative instruction after the challenged statements, and "[j]urors are presumed to follow the court's instructions." *United States v. Reyes*, 660 F.3d 454, 468 (9th Cir. 2011).

## IV.

For the reasons above, and those in the concurrently filed memorandum disposition, we affirm the judgments of conviction.

**AFFIRMED.**

---

[12] At trial, MacRitchie unsuccessfully objected to this statement as a lay opinion. MacRitchie does not pursue this argument on appeal.